The **CHEROKEE NATION OF OKLAHOMA, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 218–89L.

United States Claims Court.

July 23, 1992.

Joe R. Reeder, Washington, D.C., for plaintiff.

Thornton Withers Field, Washington, D.C., with whom was Asst. Atty. Gen. Richard E. Stewart, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge.

This case is before the court on defendant's motion to dismiss plaintiff's action pursuant to 28 U.S.C. § 2501 (1988), and as outside the jurisdiction of this court to award monetary damages. For the following reasons defendant's motion is denied.

## FACTS

Plaintiff initiated suit by filing a complaint in this court on April 21, 1989. Defendant filed a Motion to Dismiss on August 8, 1989, and included among the alleged grounds for dismissal the assertion that all of plaintiff's claims arising from its trust relationship with the United States and accruing more than six years prior to plaintiff's filing for suit were time barred by 28 U.S.C. § 2501 (1988). The court determined on October 5, 1990, that it would not rule on defendant's § 2501 motion until plaintiff had the opportunity to present additional facts, beyond the existing record, that would allow the court to decide when plaintiff's claims first accrued. The court held that all claims found to have accrued prior to April 21, 1983 were barred by the statute of limitations.

On March 13, 1991, defendant filed a second Motion to Dismiss, arguing that plaintiff's claim to ownership of non-navigable riverbed lands was also time-barred by § 2501. Defendant contended that plaintiff's alleged wrongs first accrued at least seventy-nine years beyond the controlling statute of limitations period. In response, plaintiff alleged that defendant concealed the nature of the disputed riverbeds for eight decades through defendant's "dissemination and apparent reliance on the 1906 Allotment Plats of the Cherokee Nation prepared by the Dawes Commission," which plaintiff interpreted as granting the disputed riverbeds to the Tribe.[1] Plaintiff insisted that, as a consequence of defendant's concealment, material facts of the Tribe's claim were "inherently unknowable," thereby tolling the statute of limitations. In the alternative, plaintiff argued that claim accrual must be construed in a light most favorable to plaintiff. Plaintiff asserted that it has complied with each court order for more specific pleading, and that its numerous claims first accrued within the statute of limitations. Each of defendant and plaintiff's arguments will be addressed in turn.

## DISCUSSION

### I. Ownership

The court has already limited plaintiff's complaint to instances of mineral trespass and unauthorized use of government lands that were specifically enumerated in appendices filed with plaintiff's complaint. As a threshold matter, the court must first rule on whether the Arkansas riverbed is tribal land, or whether the land in question belongs to individual allottees. If the riverbed is found to be property of the allottees, this complaint shall be dismissed. If it is found to be tribal land, plaintiff's complaint will stand.

### A. The Arkansas River Is Navigable

The land in dispute has its origins in the 1835 Treaty of New Echota, but the question of riverbed ownership arose in 1906 when legal title to much of the land was granted by allotment to individual members of the Tribe. The remainder that was not allotted or sold was held in trust by the United States for tribal use and benefit. Allotment Act, ch. 1876, 34 Stat. 137, 148

1. The Dawes Commission was created by Congress to negotiate the allotment of land to individual tribal members of the Five Civilized Tribes in preparation for the final dissolution of tribal governmental control over Indian lands. Act of March 3, 1893, Ch. 209, § 16, 27 Stat. 612, 645 (1893).

(1906). The court has no written description of the exact boundaries of allotments conveyed during that time, and has therefore relied upon the Allotment Plat Maps of the Cherokee Nation in Appendix B filed with plaintiff's complaint.

Plaintiff contended that the Plat Maps proved that riverbed land was not included in the allotments, and therefore belonged to the Tribe. Plaintiff explained that each square on the Allotment Plat Maps contains 40 square acres. Most of the land was divided into easily distinguishable squares of that measure, except for those plots of land that were irregularly shaped because they bordered the course of the riverbed. Plaintiff reasoned that had the allottees actually received rights to riverbed lands, the recorded acreage on their irregular plots would have been the full 40 acres rather than a lesser number, thus indicating title to some acreage of submerged properties. According to plaintiff, the fact that the full acreage was not recorded on those incomplete squares of land demonstrated a lack of intent to convey riverbed property to the allottees. The court finds that the Plat Maps contribute little to resolving the ownership issue. They are so difficult to read that any conclusions of riverbed ownership derived from them would be speculative.

The courts have held that "if reservation lands adjacent to navigable waters are allotted to individual Indians ... [s]ubmerged lands remain tribal property." Felix S. Cohen, *Handbook of Federal Indian Law*, 504, (1982), (citing *Montana Power Co. v. Rochester*, 127 F.2d 189 (9th Cir. 1942)); *Confederated Salish & Kootenai Tribes v. Namen*, 380 F.Supp. 452 (D.Mont. 1974), *aff'd*, 534 F.2d 1376 (9th Cir.), *cert. denied*, 429 U.S. 929, 97 S.Ct. 336, 50 L.Ed.2d 300 (1976). However, in *Choctaw & Chickasaw Nations v. Seay*, 235 F.2d 30, 35 (10th Cir.1956), *cert. denied*, 352 U.S. 917, 77 S.Ct. 216, 1 L.Ed.2d 123 (1956), the court stated a seemingly contrary rule: "[A] grant of land bounded on a river conveys to the grantee the land to the center or thread of the stream, unless the terms

of the grant and the attendant circumstances clearly denote an intention to stop at the edge or margin of the river."

These seemingly contradictory principles are reconciled by understanding the common law practice of construing land grants bordering waterways. If land bounds nonnavigable rivers, the conveyance extends to the thread of the stream as in *Choctaw & Chickasaw Nations v. Seay*. Ownership of land abutting navigable rivers is granted only to the high water mark as illustrated by *Montana* and *Confederated Salish*.

■ For plaintiff to claim ownership in the Arkansas Riverbed, the river must be navigable. The Supreme Court defined a navigable river as one "which is used, or is susceptible of being used in its ordinary condition, as a highway for commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *United States v. Brewer–Elliott Oil & Gas Co.*, 260 U.S. 77, 86, 43 S.Ct. 60, 63, 67 L.Ed. 140 (1922); *Oklahoma v. Texas*, 258 U.S. 574, 586, 42 S.Ct. 406, 411, 66 L.Ed. 771 (1922); *Economy Light & Power Co. v. United States*, 256 U.S. 113, 122, 41 S.Ct. 409, 412, 65 L.Ed. 847 (1921). In *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 633, n. 9, 90 S.Ct. 1328, 1335, n. 9, 25 L.Ed.2d 615 (1970), the Supreme Court accepted the lower court's characterization of the Arkansas River as a navigable body of water. Footnote nine of the Supreme Court's opinion stated:

> The District Court took judicial notice of the navigability at all relevant times of those portions of the Arkansas River in question, and that issue is not in dispute here. In the *Brewer–Elliott* case, this Court affirmed the finding of the District Court that "the head of navigation is and was the mouth of the Grand River." 260 U.S. at 86 [43 S.Ct. at 64].

The instant case also involves the Arkansas Riverbed in Oklahoma. This court has no reason to dispute the Supreme Court's determination that the Arkansas River is a navigable river, and proceeds upon this premise.[2] Therefore, federal common law

---

**2.** An additional factor indicating navigability is     the inference drawn from the McClellan–Kerr

dictates that allotment boundaries on the navigable portions of the Arkansas River go only to the high water mark unless there was intent to grant otherwise. The use of Oklahoma law to determine the outcome of the boundary dispute on navigable waters would lead to the same result. Oklahoma law states that title to lands bordering on navigable streams stops at the stream and all such streams are deemed to be, and remain public highways. *Railroad Co. v. Schurmeier*, 74 U.S. 272, 288 (7 Wall.) (1869). There is no evidence that this rule was abandoned by an explicit grant to allottees. The court concludes, therefore, that the allottees do not have title to the riverbed, and that the riverbed was held in trust by the United States for the benefit of the Cherokee Nation from the time of allotment until the present.

Having concluded that the navigable portion of the Arkansas riverbed is held in trust by the United States for the Tribe, the court may now address the issue of whether or not defendant concealed knowledge from plaintiff.

**B. No Concealment**

According to plaintiff, defendant distributed 1906 Allotment Plat Maps to the Cherokee Nation. Those Plats, according to plaintiff, indicated that the "riverbeds of the Canadian, Grand (Neosho), and Verdigris Rivers were not allotted and, therefore, are Cherokee Nation trust lands." Plaintiff thereby concluded that the Plat Maps clearly showed the Tribe's ownership of the riverbed. In its March 13, 1991 Motion to Dismiss, defendant admitted that Bureau of Indian Affairs (BIA) has treated the riverbeds adjacent to any allotted land as belonging to the allottees rather than the Cherokee Nation, to which plaintiff responded that "[f]or the very first time, plaintiff has now been informed that defendant has always treated the riverbeds as allotted, and, therefore, not subject to defendant's trust management." Plaintiff asserted that because defendant permitted

distribution and use of the Plat Maps, but failed to inform plaintiff of the policy to treat these lands as belonging to the allottees, facts material to the Tribe's claim were objectively "unknowable." Plaintiff therefore argued that commencement of the running of the statute of limitations should have begun on March 13, 1991, the date of defendant's alleged disclosure that BIA considered these lands as belonging to the allottees.

First, as noted above, this court finds that the Allotment Plat Maps are not dispositive as to the question of riverbed ownership. Second, the Canadian, Grand, and Verdigris riverbeds are not at issue in this action, as they were eliminated by the Order of March 5, 1992 due to plaintiff's failure to plead with the requisite specificity. Finally, plaintiff's charge of concealment does not satisfy the legal requirements of that term as understood by this court.

▮▮▮ In order to justify tolling the statute of limitations under a claim of concealment, plaintiff must show one of three things: (1) that plaintiff's injury was "inherently unknowable" at the time of accrual; (2) that defendant concealed its action with the result that plaintiff was unaware of its existence; or (3) that the plaintiff relied on a misrepresentation by the defendant. *Cochran v. United States*, 19 Cl.Ct. 455, 458 (1990); *Braude v. United States*, 585 F.2d 1049, 1051, 218 Ct.Cl. 270 (1978). The court will examine each prong of this test in turn.

BIA's election to treat the land as allotted is not dispositive of actual ownership. In fact, BIA's policy is of minimal legal importance if ownership can be determined under the law. This court does not find it reasonable for the Cherokee Nation to assume that the ambiguous Plats, together with BIA's interpretation of those Plats as allotted, rendered actual ownership "inherently unknowable." When arguing "inherent unknowability," the court must query

Navigation System built on the Arkansas River. Congress authorized the implementation of a series of improvements such as the McClellan–Kerr System for the "benefit of navigation and

control of destructive flood waters" on waterways. The Rivers and Harbors Act, ch. 595, 60 Stat. 634 (1946).

whether the plaintiff has had sufficient opportunity to discover the facts. *McDonnal v. United States*, 9 Cl.Ct. 629, 633 (1986). Sufficient opportunity to discover the facts means that plaintiff must have access to knowledge. "[T]he law assumes that 'the means of knowledge are the same thing in effect as knowledge itself' ... thus, only blameless ignorance can suffice to relieve a party from the operation of the statute of limitations." *Mitchell v. United States*, 13 Cl.Ct. 474, 477 (1987) (quoting *Wood v. Carpenter*, 101 U.S. 135, 143, 25 L.Ed. 807 (1879)). In addition, the Federal Circuit found that "the running of the statute of limitations would not be tolled when the Indians were capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim." *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 721 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984).

The party with the most incentive to establish ownership in this case was clearly the Cherokee Nation. The Tribe had ample time to inquire and obtain a concrete statement of ownership upon which it could rely for future tribal claims. Nevertheless, no inquiries took place. Merely because defendant did not take the initiative to clarify plaintiff's misconceptions does not mean that the illuminating information was "inherently unknowable." The court finds that the material facts sought were accessible, and therefore knowable.

According to the second prong of the test, defendant must have concealed information from plaintiff, resulting in plaintiff's ignorance of material facts. The Supreme Court held that intent was also required, stating that "[a]s concealment portends an allegation of fraud and implies intentional conduct, concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *LaMear v. United States*, 9 Cl.Ct. 562, 570 (1986)

(quoting *Woods v. Carpenter*, 101 U.S. 135,143, 25 L.Ed. 807 (1879)). The facts of this case provided no evidence that defendant intentionally concealed information by "trick or contrivance." Though the Plat Maps provided by the Dawes Commission were ambiguous, the ambiguity should have spurred interested parties to further investigation. Any ignorance of the fact of ownership stems only from inaction by both plaintiff and defendant in obtaining the truth. Consequently, plaintiff failed to satisfy the second prong of the test.

Finally, the court must inquire whether plaintiff relied on defendant's alleged misrepresentation. This court previously held that for a charge of concealment, defendant must have induced "plaintiff['s] reli[ance] on defendant's representations such that plaintiff[s] were under the impression that there were no claims for plaintiff[s] to assert." *Cochran*, 19 Cl.Ct. at 458; *Nitol v. United States*, 7 Cl.Ct. 405, 414 (1985). Facts argued by plaintiff illustrate that plaintiff had reason to assert claims for trespass or mismanagement long before filing its complaint. Suspicions aroused over one issue may serve as constructive notice of a related claim where reasonable diligence would have exposed it. "[W]hatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led." *Mitchell v. United States*, 10 Cl.Ct. 63, 68 (1986); *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 141, 25 L.Ed. 807 (1879) (quoting *Kennedy v. Greene*, 3 Myl. & K. 722). There is no evidence that BIA intended to misrepresent the Plats to plaintiff or induce plaintiff to rely on the Plats. Rather than seek action to quiet title and resolve this ambiguity in the Plats, plaintiff chose to do nothing. Even if plaintiff did not know of its right to quiet title, the fact that the right existed precluded a claim of reasonable reliance on defendant's Plat Maps.[3] The court in *Menominee*, 726 F.2d

---

**3.** The court has been informed that the Environment and Natural Resources Division of the United States Department of Justice, the same Division representing the United States here, is preparing litigation, or a series of lawsuits, to

quiet title to the very lands in dispute here. To the knowledge of the court no quiet title action has as yet been filed in the United States District Court for the Eastern District of Oklahoma. Should a quiet title action be filed in the district

at 721, stressed that "Indians' ignorance of their legal rights does not toll 28 U.S.C. § 2501." Plaintiff had the opportunity to discover the truth, and did not reasonably rely upon any action or omission by defendant.

Plaintiff has failed to meet the elements of the test set out in *Cochran v. United States.* Therefore, the court concludes that defendant did not conceal ownership of the Arkansas Riverbed, and as a result the statute of limitations was not tolled up until the time of defendant's disclosure in its Motion to Dismiss.

### II. Accrual

■ The crux of the dispute between plaintiff and defendant is the issue of when plaintiff's claims first accrued. The court has consistently declined to grant defendant's successive motions to dismiss until plaintiff could provide specific dates, locations, and parties to each trespass in order for the court to decide when these claims accrued. The court explained in a previous order that "[p]laintiff's claim [may] have 'first accrued' as to [a] trespasser before April 21, 1983. However, claims for failure to remove other trespassers who occupied plaintiff's land after April 21, 1983, still are viable." *Cherokee Nation of Okla. v. United States*, 21 Cl.Ct. 565, 571 (1990). The United States Court of Appeals for the Federal Circuit has defined accrual as the following: "[F]or the purposes of section 2501, ... a cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988). Before applying the test in *Hopland*, however, the court must first discuss the continuing claim doctrine,

which potentially broadens the number of actionable claims that might fall under the jurisdiction of this court.

According to the continuing claim doctrine, if defendant owes a continuing duty, a new cause of action arises each time the government breaches that duty. *Mitchell v. United States*, 10 Cl.Ct. 63, *modified on reh'g*, 10 Cl.Ct. 787, 788 (1986).[4] The continuing claim doctrine thus effectively circumvents the second prong of the *Hopland* test, and revives in part those claims that may have first accrued prior to the six year statute of limitations. Without the safe harbor offered by the continuing claim doctrine, however, only those actions *first* accruing within the six-year statutory period are actionable. The continuing claim doctrine permits a plaintiff to defer litigious action until the termination of a continuing wrong, and thus spares plaintiff from having to pursue multiple actions. *Mitchell v. United States*, 10 Cl.Ct. 63, 75 (1986). In this way the continuing claim doctrine prevents the statute of limitations from protecting an offender in an ongoing wrong, and thereby avoids claims that would be unactionable simply because they commenced prior to the statutory period.

The difficulty with the doctrine is that it undermines the intent behind the statute of limitations, which Congress established precisely to protect the government from having to defend suits long after the events sued upon occurred. *Hart v. United States*, 910 F.2d 815, 818 (Fed.Cir.1990). It also puts an end to the possibility of litigation after a reasonable time. *Id.* A three judge panel of the Federal Circuit in *Hart* firmly stated that "[e]xceptions cannot be engrafted on the statute of limitations so as to allow claims to be asserted beyond the six year time limit set forth in Section 2501. Only Congress can lengthen the time period for bringing suit against

---

court it is most likely that this court would be divested of jurisdiction. *UNR Indus., Inc. v. United States*, 962 F.2d 1013 (Fed.Cir.1992). The court is not aware why plaintiff wishes to pursue its claims in two federal courts, but questions the propriety of such a course of action.

4. This court has consistently treated each alleged trespass in the instant case as its own individual wrong. Therefore, all events that fix the government's alleged liability are not in existence for each new trespass until such trespass actually occurs, and plaintiff knew or should have known of the existence of such trespass.

the United States." *Id.* at 817. The decision in *Hart v. United States,* signalled an ostensible split in the Federal Circuit's acceptance of the validity of the continuing claim doctrine, holding that "the continuing claim doctrine cannot toll the statute of limitations governing plaintiff's claim." The *Hart* panel further reasoned that the "statute of limitations is jurisdictional in nature and, as an express limitation on the waiver of sovereign immunity, may not be waived." *Id.* at 819.

Subsequent case law rejected the possibility that *Hart v. United States* overturned the long standing continuing claim doctrine. Indeed, the difficulty with *Hart* was that the court presumably did not intend to overturn the doctrine. *Acker v. United States,* 23 Cl.Ct. 803 (1991). First, the *Hart* panel represented that the doctrine still existed but that the specific facts in *Hart* were not suitable to invoke reliance on the doctrine. *Hart,* 910 F.2d at 818. Furthermore, *Acker* contended that the continuing claim doctrine accepted by our predecessor court cannot so easily be discarded by the United States Court of Appeals for the Federal Circuit. In order for the new rule to be binding, Court of Claims precedent must be overturned *en banc* by the United States Court of Appeals for the Federal Circuit. After the enactment of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25 (1982), which authorized the establishment of this court as well as the United States Court of Appeals for the Federal Circuit, then Chief Judge Markey stated that:

> The [United States Court for the Federal Circuit] sits in banc [sic] to consider what case law, if any, may appropriately serve as established precedent. We hold that the holdings of our predecessor courts, the United States Court of Claims and the United States Court of Customs and Patent Appeals, announced by those courts before the close of business September 30, 1982, shall be binding as precedent in this court.

*South Corp. v. United States,* 690 F.2d 1368, 1369 (Fed.Cir.1982). In footnote two to *South Corp.,* then Chief Judge Markey further explained:

> The present adoption does not affect the power of this court, sitting in banc [sic], to overrule an earlier holding with appropriate explication of the factors compelling removal of that holding as precedent. If conflict appears among precedents, in any field of law, it may be resolved by the court in banc [sic] in an appropriate case.

The holding of *South Corp.* is binding law on this court. Therefore, *Hart* could not have properly overturned the continuing claim doctrine, as that decision was made by a three-judge panel and not the court sitting *en banc.* Consequently, in the instant case, claims that first accrued before April 21, 1983, but which continued extant during the six year statutory period potentially remain actionable.

## CONCLUSION

As the court noted in its Order of March 5, 1992, if plaintiff wishes to plead additional instances of trespass, each allegation must be argued specifically, i.e., identity of the trespasser, date of accrual of the trespass, and the exact lands affected by the trespass. Plaintiff may then move to add instances of trespass to this suit pursuant to the Rules of the United States Claims Court.

Based on the foregoing discussion, defendant's motion to dismiss is denied. The court orders defendant to answer all claims raised in Plaintiff's Fourth Verified Amended Complaint within thirty (30) days of the filing of this order.

IT IS SO ORDERED.