MIAMI NATION OF INDIANS OF INDIANA, INC. and Raymond White, as Chairman of the Miami Nation of Indians of Indiana, Inc., Plaintiffs

v.

Manuel LUJAN, JR., et al., Defendants.

No. S92–586M.

United States District Court, N.D. Indiana, South Bend Division.

July 26, 1993.

---

Arlinda F. Locklear, Jefferson, MD, Timothy Brazill, Indianapolis, IN, Henry Sockbeson, Richard Dauphinais, Native American Rights Fund, Washington, DC, for plaintiffs.

Kevin Meisner, Scott Keep, Dept. of the Interior, Div. of Indian Affairs, R. Anthony Rogers, U.S. Dept. of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, DC, for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

In this part of this case, the plaintiffs seek an order declaring that the United States Department of the Interior must recognize the Miami Nation of Indians of Indiana as an Indian tribe. That claim is based on an 1854 treaty between the federal government and the Miami Indiana tribe. The plaintiffs argue that the federal government withdrew acknowledgement of the Indiana Miami tribe due to an erroneous decision by an assistant attorney general in 1897. The plaintiffs, however, have waited far too long to bring this claim. The law gives parties with claims against the federal government six years within which to bring their claims. Because the plaintiffs have not shown that the federal government has taken any action based on the 1897 decision in the six years before this suit was filed, the defendants are entitled to judgment on this part of the complaint. The plaintiffs' other claims remain to be decided later.

All parties seek summary judgment as to Count 1 of the complaint, and have filed excellent briefs; the court heard argument on the motion on July 23. For the reasons that follow, the court finds that the defendants' motion for summary judgment as to Count 1 must be granted on grounds of the statute of limitations, and for the same reason, the plaintiffs' motion must be denied.

Historically, the Miami Indian tribe lived in northern and central Indiana. Between 1795 and 1840, the Miamis entered into a number of treaties with the United States, ceding millions of acres of land to the government. In some of those treaties, the Miamis reserved tracts of land for individual tribal members or for bands of the Miamis.

In the treaty of November 28, 1840, 7 Stat. 582, the Miamis ceded to the government "all of their remaining lands in Indiana" save eight sections of land previously reserved for bands of the Miamis or patented to tribal leaders. The 1840 Treaty also provided that within five years, the Miamis would remove from Indiana to territory west of the Mississippi River located in what is now east-central Kansas. Certain tribal leaders and their

families, however, were exempted from the planned removal by virtue of certain patents. These patents included the Meshingomesia Reserve, patented to Chief Meshingomesia in trust for his band in accordance with the 1840 Treaty, *see* 7 Stat. 582; patents to Chief Francis Godfrey in the Treaty of 1838, *see* 7 Stat. 569; and patents to Principal Chief John B. Richardville and John Lafountain (who succeeded Chief Richardville) under the 1840 Treaty. *See* 7 Stat. 582. Of these patents, only the Meshingomesia Reserve was held communally.

The Miamis strongly resisted their removal to the Kansas territory. In early 1846, the Commissioner of Indian Affairs ordered that annuity payments to the Miamis be withheld until the tribe removed; federal troops were ordered to Peru, Indiana to forcibly remove the Miamis, if necessary. By October 1846, about half the Miamis had moved from Peru to the Kansas Territory. After this emigration, there was a group of Miamis in the Kansas Territory (the "Kansas Miamis") and a group of Miamis in Indiana on individual land grants and on the communal Meshingomesia Reserve (the "Indiana Miamis").

In 1854, the government entered into treaty negotiations with the Kansas Miamis and the Indiana Miamis, and a treaty was signed on June 5, 1854. Treaty of 1854, 10 Stat. 1093 ("1854 Treaty"). In Article 1 of the 1854 Treaty, the Kansas Miamis ceded all but 70,000 acres of their Kansas lands, with the excepted land to be surveyed and patented to individual Kansas Miamis. In return, the Kansas Miamis received $200,000.00. The treaty specifically provided that the Indiana Miamis would not share in those proceeds.

Article 4 dealt with the division of annuity payments between the Kansas Miamis and the Indiana Miamis, with both groups relinquishing a permanent annuity in favor of a one-time payment. The treaty also provided that the President would, if the Indiana Miamis wished, invest their payment and pay the Indiana Miamis annual interest. Representatives of the Indiana Miamis signed the 1854 Treaty and returned to Indiana where, upon their return, the full Tribal Council in Indiana sent representatives back to Washington to revise Article 4. A "fully authorized deputation" of Indiana Miamis negotiated a revision to Article 4 of the Treaty, which received Senate approval on August 4, 1854; no Kansas Miamis participated in the second round of negotiations to revise Article 4.

Revised Article 4 provided that the President was to invest the Indiana Miamis' share of the annuity payment, with annual interest paid to the tribe. The Article also listed the Indiana Miamis who would benefit under the treaty. No other persons were eligible "unless other persons shall be added to said list by the consent of said Miami Indians of Indiana, obtained in Council, according to the custom of Miami Tribe of Indians." Revised Article 4 did not apply to the Kansas Miamis.

Congress later enacted legislation specifically concerning the Indiana Miamis. In 1872, Congress authorized the partition of the Meshingomesia Reserve. *See* 17 Stat. 213. From 1856 to 1881, Congress made annual appropriations of interest payments to the "Miamies of Indiana" pursuant to the 1854 Treaty. *See* 11 Stat. 65, 71, and 21 Stat 485, 491. In 1881, Congress appropriated to the Indiana Miamis the principal sum due pursuant to the 1854 Treaty. *See* 21 Stat. 414, 433. In 1895, Congress appropriated $48,528.38 to repay the Indiana Miamis for money taken from their tribal funds in violation of the 1854 Treaty. *See* 28 Stat. 876, 903. As late as 1966 and 1972, Congress appropriated funds to satisfy an Indian Claims Commission judgment, and distributed the funds to the Indiana Miamis. *See* 80 Stat. 909, and 86 Stat. 199.

The Indiana land allotted to the Indiana Miamis was partitioned among individual tribe members as treaty patents or statutory allotments. By 1881, the Meshingomesia Reserve allotments had become taxable. During the 1880s, the State of Indiana had begun levying property taxes upon the other treaty patents. The Indiana Miamis resisted paying those taxes and requested the Department of the Interior's assistance in bringing suit. A lawsuit eventually was filed, and a federal court held that because the individual Indiana Miamis were members of a recognized tribe, their land was not subject to real property taxes. *Wau–Pe–Man–Qua, alias*

*Mary Strack v. Aldrich,* 28 F. 489, 493 (Circuit Court, D.Ind.1886).

The Indiana Miamis then sought the Secretary of the Interior's assistance in recovering past taxes levied against the individual Indiana Miamis' land which the tribal members already had paid. The Secretary referred the matter to the Assistant Attorney General Willis Van Devanter,[1] who decided that the Indiana Miamis, having been made United States citizens and having had their land allotted, no longer were tribal Indians subject to the United States' trust responsibilities. *See* November 23, 1897 Opinion of Asst. Attorney General Van Devanter, 25 Decisions of the Department of the Interior and General Land Office in Cases Relating to the Public Lands 426, 431 (GPO 1898) (Exhibit E, Plaintiffs' Motion for Partial Summary Judgment). The Interior Secretary approved the decision and withdrew acknowledgement of the Indiana Miamis, and has since refused to acknowledge the Indiana Miamis as an Indian tribe.

In 1978, the Department of the Interior published final regulations providing a procedure for acknowledging the existence of Indian tribes. *See* 25 C.F.R. § 83. On March 25, 1980, the plaintiffs filed a petition for federal acknowledgment as an Indian tribe pursuant to these regulations. In 1990, the Assistant Secretary of the Interior published his proposed finding that the plaintiffs did not meet the *acknowledgement regulations'* community and political influence criteria and, therefore, did not exist as an Indian tribe. 55 Fed.Reg. 29,423 (1990). On June 18, 1992, the Assistant Secretary published his final determination that the plaintiffs did not exist as an Indian tribe, and were not entitled to a government-to-government relationship with the United States. 57 Fed. Reg. 27,312 (1992). This determination became effective on August 17.

On September 11, 1992, the plaintiffs filed their complaint in this court. The first of the complaint's four counts basically seeks a ruling that the Secretary of the Interior's decision withdrawing federal recognition of the Indiana Miamis was *ultra vires,* and that the

court should declare that the plaintiff Miami Nation of Indians of Indiana, Inc. "is now and always has been a recognized Indian tribe entitled to acknowledgment" by the Department of the Interior. The remaining counts question the constitutionality and validity of the Department of the Interior's regulations for federal acknowledgement, as well as the application of those regulations to the plaintiff. The parties have filed cross-motions for summary judgment solely as to Count 1 of the complaint.

The parties raise several arguments; the court expressed its tentative views as to some of those arguments at the summary judgment hearing. Because some of the parties' arguments may be pertinent to the complaint's remaining counts, as to which summary judgment is not yet sought, and because resolution of Count 1 turns on a single issue, the court declines comment on whether the 1854 Treaty recognized the Indiana Miamis as a tribe, whether the 1897 Van Devanter opinion was *ultra vires* because only Congress can terminate a relationship with an Indian tribe, whether the Interior Department's ensuing withdrawal of acknowledgement of the Indiana Miamis was correct, and whether the present plaintiff continued to exist as a tribe and/or abandoned its existence since 1854. These issues are barred, within the context of the declaratory judgment action comprising Count 1, by the applicable statute of limitations.

The government contends that the declaratory judgment claim is barred by the statute of limitations found in 28 U.S.C. §§ 2401 and 2501. The government contends that the Indiana Miamis have had since 1897 to raise any and all claims for damages arising from the lack of recognition based on the Department of the Interior's withdrawal of recognition, and their failure to raise the issue in a timely fashion prevents suit at this time.

The plaintiffs contend that their action is timely under the continuing claim doctrine, which provides that if the defendant owes a continuing duty to the plaintiff, a new cause of action arises each time the defendant

---

1. Mr. Van Devanter, who was born in Marion, Indiana, less than twenty miles from the lands in question, later became an Associate Justice of the United States Supreme Court.

breaches the duty. *Cherokee Nation of Oklahoma v. United States,* 26 Cl.Ct. 798, 803 (1992). The continuing claim doctrine prevents the statute of limitations from protecting an offender in an ongoing wrong, and avoids claims that would be barred because they began before the statutory period. 26 Cl.Ct. at 803.

The Seventh Circuit has recognized the continuing claim doctrine in certain circumstances, *see Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992) ("The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period. For purposes of the limitations period, courts treat such a combination as one continuous act that is within the limitations period."), and the doctrine has been recognized in actions against the government, *Cherokee Nation of Oklahoma v. United States,* 26 Cl.Ct. at 803, as well as in actions seeking affirmative relief. *See Virginia Hospital Assoc. v. Baliles,* 868 F.2d 653, 663 (4th Cir.1989), *aff'd,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990).

The plaintiffs contend that Congress recognized its tribal status in the 1854 Treaty, and that Congress has never terminated that status. The plaintiffs claim that based upon the 1897 Van Devanter opinion, the Department of the Interior refused to acknowledge the Indiana Miamis as a tribe, but under the Constitution only Congress can terminate recognition of the tribe. Therefore, the plaintiffs argue that the Department of the Interior is under a continuing duty to acknowledge the Indiana Miamis' tribal status, and the Department's refusal to so acknowledge is a breach of duty continuing to this day. The plaintiffs contend that the Department's refusal cannot be considered a single event that caused the Indiana Miamis harm; rather, the Department's refusal to acknowledge continues to harm the tribe. Thus, under the continuing claim doctrine, the plaintiffs contend that their action is timely.

To support their position, the plaintiffs cite *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573 (Fed.Cir.1987). In that case, the court intimated, in dicta, that the continuing claim doctrine could have possible application as long as the underlying wrong—the unlawful termination of tribal status—remained uncorrected. 855 F.2d at 1581–82. However, the court was speaking of actions for recovery of monies due to the arbitrary or unlawful denial of statutory benefits based upon the illegal termination of tribal status, not merely the termination of tribal status itself. *Id.* The *Hopland* court stated that "the wrongful termination of an Indian tribe's federal tribal status could give rise to a monetary claim for lost benefits against the government if, apart from the illegal termination, the tribe could sue for an arbitrary or unlawful denial of such benefits." 855 F.2d at 1581 (citing *Duncan v. United States,* 667 F.2d 36, 48, 229 Ct.Cl. 120 (1981), *cert. denied,* 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983)).

The plaintiffs have not sought recovery for the arbitrary or unlawful denial of statutory benefits; the only relief sought in Count 1 is for a declaration that the Miami Nation of Indiana is now and has always been a federally recognized Indian tribe, and that the Department of the Interior must so recognize the tribe. The only act in Count 1 identified by the plaintiffs as constituting a refusal of acknowledgement is the Department of the Interior's 1897 withdrawal of recognition. That the harm stemming from an 1897 decision continues to today is not dispositive; the plaintiffs must link that 1897 decision with a governmental act or action within the limitations period. *Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992) ("The continuing violation doctrine allows a plaintiff to get relief for a time-barred act by linking it with an act that is within the limitations period."). The plaintiffs have not linked the 1897 decision with any act within the statute of limitations.

The plaintiffs argue that the continuing claim is based on a continuing omission: each time the government denies, as it did at the summary judgment hearing, that the Indiana Miamis are a federally recognized tribe, the claim runs anew. The court cannot agree. If a mere unchanging status is a continuing claim, there is no statute of limitations for acts that produce unchanging conditions: hiring decisions still uncured, debts still unpaid, and torts still uncompensated would

remain actionable in perpetuity. Here, lack of formal recognition is the gravamen of the plaintiffs' complaint, so only formal recognition could bring an end to the "continuing claim"; acceptance of the plaintiffs' argument effectively would eradicate the statute of limitations by preserving their cause of action until it becomes moot. *See Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1579–1580 ("[I]t makes little sense to conclude that the Band could only bring an action for wrongful termination once the government acknowledged the wrongful termination because, at that point, the Band would no longer need to sue to prove that.").

Section 2401 of Title 28 of the United States Code provides, in pertinent part, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues"; 28 U.S.C. § 2501 provides, in pertinent part, that "every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." A cause "first accrues" when all events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to file an action. *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577.

This case was filed in 1992; all necessary events that allegedly fixed the government's liability with respect to Count 1 occurred in 1897. The plaintiffs concede that the Indiana Miamis knew of the 1897 action and its effects well before 1986, and have pointed to nothing that occurred after 1986, other than the continued omission of formal recognition, that the court may link to the 1897 Van Devanter opinion. The 1992 denial of the petition for acknowledgement did not rely on the 1897 Van Devanter opinion.

The statute of limitations bars the Indiana Miamis' action for declaratory relief under Count 1. The court need not address the parties' arguments concerning the Indian Claims Commission Act, previously codified at 25 U.S.C. § 70k, or concerning the equitable doctrine of laches.

For the foregoing reasons, the court now GRANTS the defendants' motion for summary judgment on Count 1, and DENIES the plaintiffs' motion for summary judgment on Count 1. The cause remains at issue on the remaining counts of the complaint; the court will arrange a scheduling conference with respect to the handling of those counts.

SO ORDERED.