**MIAMI NATION OF INDIANS OF INDIANA, INC., et al., Plaintiffs,**

v.

**Bruce BABBITT, et al., Defendants.**

**No. 3:92–CV–586RM.**

United States District Court, N.D.Indiana, South Bend Division.

April 24, 1995.

Arlinda F. Locklear, Jefferson, MD, Richard Dauphinais, Native American Rights Fund, Washington, DC, David L. Kiley, Sr., Albert C. Harker, Kiley Osborn Kiley Harker Rogers Michael and Certain, Marion, IN, for Miami Nation of Indians of Indiana, Inc.

Arlinda F. Locklear, Jefferson, MD, Richard Dauphinais, Native American Rights Fund, Washington, DC, Albert C. Harker, Kiley Osborn Kiley Harker Rogers Michael and Certain, Marion, IN, for Raymond White.

Kevin Meisner, Scott Keep, Dept. of Interior, Div. of Indian Affairs, R. Anthony Rogers, U.S. Dept. of Justice, Environmental & Natural Resources Div., General Litigation Section, Washington, DC, for Manuel Lujan, Jr., Dept. of Interior, Bureau of Indian Affairs, Branch of Acknowledgment and Research, U.S.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause is before the court on the parties' separate motions for partial summary judgment, the plaintiffs' motion for a hearing on the motions for summary judgment, the plaintiffs' motion for an order directing the government to complete the administrative record ("motion to compel discovery"), and the defendants' motion to strike or deny the plaintiffs' motion to compel discovery. A hearing on the summary judgment motions is unnecessary in light of the parties' excellent briefs, and would only delay the motions' resolution. Accordingly, the plaintiffs' motion for a hearing is denied.

The issues before the court today do not address the eventual decision by the Secretary of the Interior not to acknowledge the Miamis as a tribe, but instead focus on the validity of the regulations under which that decision was made. In today's issues, the Miamis contend that the Secretary of the Interior exceeded his authority in issuing the regulations in 1978, that the regulations are invalid because they omit explanations and definitions and because (the Miamis believe) the Secretary acted arbitrarily and capriciously in adopting the regulations. The Miamis also argue that the regulations do not satisfy constitutional requirements of due process and equal protection. For the reasons that follow, the court disagrees with each of these arguments.

Again, this ruling does not decide whether the Secretary acted properly in refusing to acknowledge the Miamis as a tribe. In light of this decision that the regulations are valid, the court will turn to that issue in the weeks to come.

In addition to denying the plaintiffs' motion for summary judgment and granting the defendants' motion for summary judgment, the court also, for reasons set forth below, grants the defendants' motion to strike and orders the plaintiffs' motion to compel discovery stricken, without prejudice to refile exhibiting compliance with District Rule 37.1.

I.

The court presumes familiarity with the facts concerning this cause and with the court's prior orders, including *Miami Nation v. Lujan,* 832 F.Supp. 253 (N.D.Ind.1993), and therefore will repeat them only briefly here.

The Miami Indian tribe (the "Miamis") historically lived in the central and northern regions of Indiana. From 1795 to 1840, the Miamis entered into several treaties with the United States. As a result of one of those treaties, the Miamis split into two groups, with one group relocating to Kansas and the other remaining in Indiana. Generally, the United States interacted with the Indiana Miamis as covered under the United States' trust responsibilities. *See, e.g., Miami Nation v. Lujan,* 832 F.Supp. at 253–255 (discussing history of relations between the Miamis and the United States). In 1897, however, Assistant Attorney General Willis Van Devanter decided that the Indiana Miamis no longer were tribal Indians, and thus no longer were covered by the United States' trust responsibilities. *See id.* at 255. The Secretary of the Interior (the "Secretary") approved the decision and withdrew acknowledgment of the Indiana Miamis; the Department of the Interior (the "Department") has refused to acknowledge the Indiana Miamis as an Indian tribe since then.

Until 1978, the Department made its decisions whether to acknowledge an Indian tribe on a case-by-case basis. *See* 25 Fed.Reg. 39,361 (1978). In 1978, the Department promulgated regulations providing a procedure for acknowledging the existence of Indian

tribes. *See* 25 C.F.R. Part 83 (1978)[1] (the "1978 regulations"). On March 25, 1980, the Miamis filed a petition for federal acknowledgment as an Indian tribe pursuant to these regulations. On July 19, 1990, the Assistant Secretary of the Interior published his proposed finding that the Miamis do not meet the political influence and community criteria of the acknowledgment regulations. 55 Fed. Reg. 29,423 (1990). On June 18, 1992, the Assistant Secretary published his final determination that the Miamis do not exist as an Indiana tribe and, therefore, are not entitled to a government-to-government relationship with the United States. 57 Fed.Reg. 27,312 (1992).

The Miamis then filed a four-count complaint in this court. Count 1 sought a ruling that the Secretary of the Interior's decision withdrawing federal recognition of the Indiana Miamis in 1897 was *ultra vires;* the court ruled that the applicable statute of limitations barred that claim. *Miami Nation v. Lujan,* 832 F.Supp. at 257. Count 4 of the complaint, which is not presently before the court, seeks review of the Department's application of the acknowledgement regulations to the Miamis.

Counts 2 and 3 of the complaint challenge the validity of the Department's 1978 regulations. In Count 2, the Miamis allege that the defendants exceeded their congressional authorization in issuing the regulations by allegedly imposing stricter requirements upon tribes seeking recognition after 1978 than those imposed before 1978. In Count 3, the Miamis allege that the regulations are invalid because they fail to define key terms or specify a burden of proof, because they provide no mechanism for independent review or administrative appeal, and because the regulations treat Indian tribes recognized before 1978 differently than those petitioning for tribal status after 1978.

The parties have filed cross-motions for partial summary judgment with respect to Counts 2 and 3. The Miamis seek a declaration that the 1978 regulations (1) exceed the Department of the Interior's statutory au-

thority; (2) are not in accordance with the law, are without rational basis, and are arbitrary and capricious; and (3) violate the due process and equal protection provisions of the Constitution. The defendants seek a ruling that the 1978 regulations (1) are within the Congressional authority of the Secretary of the Interior to have promulgated; (2) have been promulgated in accordance with law and are not arbitrary, capricious, or without rational basis; and (3) do not violate any provision of the United States Constitution.

A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent.

The parties cannot rest on mere allegations in the pleadings, or upon conclusory allegations in affidavits. The court must construe the facts as favorably to the non-moving party as the record will permit, and draw any permissible inferences from the materials before it in favor of the non-moving party, as long as the inferences are reasonable. The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law.

*Conery v. Bath Associates,* 803 F.Supp. 1388, 1392–1393 (N.D.Ind.1992) (citations omitted).

Both parties agree that there is no material fact in genuine dispute, and that the issues presented in Counts 2 and 3 of the Miamis' complaint can be resolved completely on summary judgment.

---

1. 25 C.F.R. Part 83 was revised in 1994. Both parties agree that this cause pertains solely to the regulations as they appeared from 1978 until the 1994 revision. Unless otherwise specified, all references to 25 C.F.R. Part 83 are to the 1978 version at issue in this cause.

## II.

The Miamis first contend that the 1978 regulations exceed the authority of the Secretary of the Interior to regulate the acknowledgment of Indiana tribes and are thus *ultra vires*. The parties first dispute the appropriate level of deference to be given the Secretary's interpretation of his statutory authority to promulgate the 1978 regulations. The Miamis contend that the court owes no deference to the Secretary's interpretation of his authority, while the defendants contend that the court owes the Secretary's interpretation great deference.

## A.

■ In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–844, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694 (1984), the Supreme Court stated:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such cases, a court may not substitute its own construction of a statutory provision for a reasonable interpretation by the administrator of an agency.

(footnotes omitted).

No statute explicitly authorizes the Secretary of the Interior to promulgate regulations concerning the acknowledgment of Indian tribes; the Secretary relied upon his general statutory authority contained in 25 U.S.C. §§ 2 and 9 when promulgating the acknowledgment regulations. 25 C.F.R. Part 83. These statutes authorize the Secretary to manage Indian affairs and prescribe necessary regulations for that purpose. 25 U.S.C. § 2, enacted in 1832, states that:

The Commissioner of Indian affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian Affairs and of all matters arising out of Indian Affairs.

25 U.S.C. § 9, enacted in 1834, states that:

The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs, and for settlement of the accounts of Indian affairs.

Using these statutes as authority, the Secretary promulgated the 1978 regulations to define what constitutes an acknowledged Indian tribe for the purposes of statutes relating to and conferring benefits upon Indian tribes. 25 C.F.R. § 83.2.

Although the Miamis assert that such authority is "tenuous," they do not contend that the Secretary is wholly unauthorized to promulgate any regulations concerning the acknowledgment of Indian tribes.[2] Rather, the

---

2. Indeed, the District of Columbia Court of Appeals expressly upheld the Secretary's authority

Miamis contend that the Secretary exceeded his authority in promulgating these particular regulations. The Miamis contend both that the Secretary lacks statutory authority to impose different and more burdensome requirements for federal acknowledgment after 1978 than those imposed before 1978, and that the Secretary lacks statutory authority to impose any standard other than voluntary abandonment on previously recognized Indian tribes.

The Miamis challenge the Secretary's authority to promulgate the regulations as written in 1978, rather than attacking the Secretary's authority to promulgate any regulations governing tribal acknowledgment. In other words, the issue before the court is not whether the Secretary had authority to promulgate any regulations governing the acknowledgment of Indian tribes—for the Miamis concede this point—but rather whether the regulations as promulgated exceed the Secretary's statutory authority.

Resolution of this issue nonetheless requires a determination of whether the 1978 regulations are "legislative" or "interpretive," so that the court may determine the proper level of deference to which they are entitled. The Miamis contend that a regulation is only legislative when Congress has specifically delegated to the Secretary either express or implicit authority to prescribe a method for implementing a statute or for developing standards to give meaning to its terms. The Miamis further contend that "[b]y way of contrast, interpretive regulations are those promulgated under the agency's general authority to prescribe all needful regulations." Thus, the Miamis contend that the acknowledgment regulations necessarily are interpretive because they were promulgated under the Secretary's general authority to adopt needful regulations.

■■■ "The distinction between interpretive (or 'interpretative') and substantive (or 'legislative') rules is admittedly far from crystal-clear." *Metropolitan School District of Wayne Township v. Davila,* 969 F.2d 485, 489 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1360, 122 L.Ed.2d 740 (1993) (*quoting Chemical Waste Management, Inc. v. United States Environmental Protection Agency,* 869 F.2d 1526, 1534 (D.C.Cir.1989)). Determining whether a rule is interpretive or legislative begins with the agency's characterization of the rule. *Id.* "The agency's characterization is not dispositive, but is a relevant factor." *Id.* (citations omitted). The court next considers the general characteristics of the rule. " '[I]nterpretive rules are statements as to what the administrative officer thinks the statute or regulation means,' whereas legislative rules have 'effects completely independent of the statute.' " *Id.* at 490 (quoting *United Technologies Corp. v. United States Environmental Protection Agency,* 821 F.2d 714, 718 (D.C.Cir.1987)).

■■■ In general, " 'Regulations,' 'substantive rules' or 'legislative rules' are those which create law, usually implementary to an existing law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means." *Alabama Tissue Center of the University of Alabama Health Service Foundation, P.C. v. Sullivan,* 975 F.2d 373, 377 (7th Cir.1992) (quoting *Indiana Dept. of Public Welfare v. Sullivan,* 934 F.2d 853, 856 (7th Cir.1991)). "Legislative rules are regulations that an agency has issued pursuant to a congressional delegation of authority and has promulgated in accordance with 'the normal procedures associated with force-of-law rule making,' namely, 'notice-and-comment rule making pursuant to [5 U.S.C. § 553 of the Administrative Procedures Act].' " *Hanson v. Espy,* 8 F.3d 469, 473 at n. 3 (7th Cir.1993) (quoting *Doe v. Reivitz,* 830 F.2d 1441, 1447 (7th Cir.1987), *amended,* 842 F.2d 194 (7th Cir. 1988)).

Working backwards from this formulation, the Miamis do not dispute that the 1978 regulations were promulgated with the normal procedure of notice-and-comment rule-making in accordance with 5 U.S.C. § 553 of the Administrative Procedures Act ("APA"). Thus, the remaining question is whether the 1978 regulations were promulgated pursuant

to promulgate the 1978 regulations under 25 U.S.C. §§ 2 and 9. *James v. United States Dept. of Health and Human Services,* 824 F.2d 1132 (D.C.Cir.1987).

to a congressional delegation of authority. At least one court has held that the 1978 regulations were promulgated pursuant to a specific delegation of authority. In *James v. United States Dept. of Health and Human Services,* 824 F.2d 1132, 1137–1138 (D.C.Cir. 1987), the court noted that:

> Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations. 25 U.S.C. §§ 2, 9. The purpose of the regulatory scheme set up by the Secretary of the Interior is to determine which Indian groups exist as tribes. 25 C.F.R. § 83.2

> \* \* \* \* \* \*

> As noted, Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations. Regulations establishing procedures for federal recognition of Indian tribes certainly come within the area of Indian affairs and relations.

*Cf. Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 59 (2nd Cir.1994) (court would not determine the plaintiff's status as an Indian tribe until such determination was made by the Department of the Interior, which has the authority to promulgate regulations pursuant to 25 U.S.C. § 9, and which has created a "structured administrative process to acknowledge 'nonrecognized' Indian tribes using uniform criteria.").

The court agrees with the *James* court's conclusion that the 1978 regulations have been promulgated pursuant to authority granted in 25 U.S.C. §§ 2 and 9. *See James v. United States Dept. of Health and Human Services,* 824 F.2d at 1137–1138. The 1978 regulations were promulgated under Congress' delegation of authority to the President and to the Secretary to prescribe regulations concerning Indian affairs and relations. *See* 25 U.S.C. §§ 2 and 9. To the extent that a regulation is considered " 'legislative' in the sense of having been promulgated pursuant to a specific grant by Congress of authority to regulate the area in question," *Archer–Daniels–Midland Co. v. United States,* 37 F.3d 321, 324 (7th Cir.1994), the court agrees that the 1978 regulations, which establish procedures for federal recognition

of Indian tribes, "certainly come within the area of Indian affairs and relations." *James v. United States Dept. of Health and Human Services,* 824 F.2d at 1138.

Legislative regulations are entitled to deference under *Chevron* partially because they have been promulgated by agencies with rule-making power.

The Supreme Court made clear in *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82, that only statutory interpretations by agencies with rule-making powers deserve substantial deference. The principal rationale underlying this deference is that in this context the agency acts as a congressional proxy; Congress develops the statutory framework and directs the agency to flesh out the operational details. But Congress typically does not permit the agency to run free in this endeavor; the Administrative Procedures Act establishes certain procedures that the agency must follow. Chief among them is the notice-and-comment provisions of the APA. 5 U.S.C. § 553. This rulemaking process bears some resemblance to the legislative process and serves to temper the resultant rules such that they are likely to withstand vigorous scrutiny. It is this process that entitles the administrative rules to judicial deference.

*Atchison, Topeka & Santa Fe Railway Co. v. Pena,* 44 F.3d 437, 441–442 (7th Cir.1994).

Accordingly, the court concludes that it should give the 1978 regulations the deference deemed appropriate under *Chevron.*

### B.

■ The first step in applying *Chevron* is to determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. at 842–43, 104 S.Ct. at 2781. Here, the purpose of the 1978 regulations is to specifically define what constitutes an "Indian tribe" for purposes of federal acknowledgment. Although Con-

gress has passed legislation specifically directed towards "Indian tribes," the parties dispute whether Congress has spoken directly to the precise question of what constitutes an "Indian tribe."

The Miamis contend that Congress has specifically defined "Indian tribe," and that the 1978 regulations have altered Congress' intended meaning. The Miamis contend that the general statutes establishing the trust relationship between the United States and Indian tribes, beginning with 25 U.S.C. §§ 2 and 9, reveal a Congressional intent to recognize "all Indian tribes." For example, contemporaneous with its enactment of 25 U.S.C. § 9, Congress enacted a series of statutes entitled, "an act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers." Act of June 30, 1834, 4 Stat. 729, ch. 161 (commonly referred to as the Indian Trade and Intercourse Act or the Nonintercourse Act). Additionally, the Miamis contend that Congress intended a statute enacted in 1830 to apply to "all Indian tribes." *See* An Act to Provide for an Exchange of Lands with the Indians Residing in any of the States or Territories, and for Their Removal West of the River Mississippi, Act of May 28, 1830, ch. 148, § 2.

Some courts have read the Nonintercourse Act to apply to all Indian tribes, whether "recognized" or not. For example, in *Joint Tribal Council of Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir.1975), the court stated that:

> Congress is not prevented from legislating as to tribes generally; and this appears to be what it has done in successive versions of the Nonintercourse Act. There is nothing in the Act to suggest that "tribe" is to be read to exclude a bona fide tribe not otherwise federally recognized.

(footnote omitted).

In the *Passamaquoddy Tribe* case, however, the parties agreed that the plaintiff existed as a "tribe." Thus, the question before that court was, assuming that the plaintiff was a tribe, whether the plaintiff was covered under the Nonintercourse Act if it had never been officially recognized by a specific act of Congress or by treaty. The case was decided before the promulgation of the 1978 regu-

lations and thus could not consider the Department's regulations concerning what constitutes a bona fide tribe. Indeed, the court further stated that:

> This is not to say that if there were doubt about the tribal status of the Tribe, the judgments of officials in the federal executive branch might not be of great significance. The Supreme Court has said that, "it is the rule of this court to follow the executive and other political departments of the government, whose more special duty is to determine such affairs." *United States v. Sandoval*, 231 U.S. 28, 47 [34 S.Ct. 1, 6, 58 L.Ed. 107] (1913), *quoting United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865).

528 F.2d at 377. Thus, this case acknowledges that if there are doubts concerning the tribal status of a purported tribe, the proper course of action would be to defer to the decision of the executive with authority to make such decisions.

The court agrees with the defendants that Congress has not unambiguously defined what is meant by "Indian tribe." For example, under Section 19 of the Indian Reorganization Act of 1934, 25 U.S.C. § 479, the term "Indian" is defined as all persons of Indian descent who are members of "any recognized Indian tribe now under Federal jurisdiction." The statute does not define "recognized," but defines "Tribe" as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." *Id.* At best, this is a circular definition. *See also* The Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. § 450b(b) (defining Indian tribe to mean "Indian tribe, band, nation, or other organized group or community ... which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians."); The Indian Financing Act of 1974, 25 U.S.C. § 1452(c) (defining tribe to mean "any Indian tribe, band, group, pueblo, or community ... which is recognized by the Federal Government as eligible for services from the Bureau of Indian Affairs.").

The court cannot conclude based on this record that even if Congress has manifested

an intent to legislate with respect to "all Indian tribes," Congress also unambiguously intended to legislate to any group purporting to be an Indian tribe. As the defendants contend, to say that Congress has legislated with respect to all Indian tribes begs the question of "what is an Indian tribe?" The purpose of the 1978 regulations is to develop uniform standards and procedures to answer that question.

Since Congress has not directly addressed the precise question at issue:

> the court does not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 843, 104 S.Ct. at 2782. Indeed, "[t]he court need not conclude that the agency's construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11.

When, as here, the grant of authority was implicit rather than explicit, the court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 844, 104 S.Ct. at 2782. Further,

considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations

> "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations."

> "... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute that the accommodation is not one that Congress would have sanctioned."

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 844–845, 104 S.Ct. at 2782–2783 (quoting *United States v. Shimer*, 367 U.S. 374, 382, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961) (citations omitted)).

The court reviews the validity of the 1978 regulations with these guidelines in mind.[3]

### III.

The Miamis contend that (1) the Secretary lacks statutory authority to impose different and more burdensome requirements for federal acknowledgment after 1978 than those imposed before 1978; and (2) the Secretary lacks statutory authority to impose any standard other than voluntary abandonment on

---

**3.** In addition to relying upon the deference mandated by *Chevron*, the defendants also contend that the court must give the Secretary's determination as to the tribal status of an Indian tribe great deference because "the consequence of tribal status is to establish, or recognize, a political sovereignty and political relationship." *See* Defendants' Summary Judgment Motion at 12. The defendants rely upon *United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed. 182 (1865), in support of this contention:

> It is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty is to determine such affairs. If by them

Indians are recognized as a tribe, this court must do the same.

Whatever its application to this case, the political question doctrine does not apply to the court's analysis with respect to these motions. Were the court to accept the defendants' contention that the political question doctrine applies, the court would need to defer to the recognition determination made by the "executive and other political departments." The issues presently before the court, however, do not address the validity of the Department's recognition determination with respect to the Miamis; that claim is raised in Count 4, which is not presently before the court.

previously recognized Indian tribes. The court addresses each contention in turn.

### A.

■ The Miamis first contend that the 1978 regulations are invalid because the Secretary lacks statutory authority to impose different and more burdensome requirements for federal acknowledgment after 1978 than those imposed before 1978. To support this contention, the Miamis primarily argue that the 1978 regulations violate Congress' plain intent to recognize all Indian tribes. The court does not find that Congress has exhibited a plain intent to recognize "all Indian tribes."

The Miamis present a detailed history of standards that different entities have employed to determine tribal status. For example, the Miamis rely upon the Supreme Court's definition of an Indian tribe in 1901: "By tribe, we understand a body of Indians of the same or similar race, united in a community under one leadership or government and inhabiting a particular, though sometimes ill-defined, territory." *Montoya v. United States,* 180 U.S. 261, 266, 21 S.Ct. 358, 359, 45 L.Ed. 521 (1901); *see also United States v. Candelaria,* 271 U.S. 432, 439, 46 S.Ct. 561, 562, 70 L.Ed. 1023 (1926) (using the *Montoya* definition with respect to the Indian Trade and Intercourse Act).

The Miamis also refer the court to criteria expressed in a 1942 treatise by Felix Cohen, then Assistant Solicitor of the Department of the Interior, that summarized considerations previously relied upon by the Department in considering which groups constituted Indian tribes:

> The considerations which, singly or jointly, have been particularly relied upon in reaching the conclusion that a group constitutes a "tribe" or "band" have been:
>
> (1) That the group has had treaty relations with the United States.
>
> (2) That the group has been denominated a tribe by act of Congress or Executive Order.
>
> (3) That the group has been treated as having collective rights in tribal lands or

funds, even though not expressly designated a tribe.

> (4) That the group has been treated as a tribe or band by other Indian tribes.
>
> (5) That the group has exercised political authority over its members, through a tribal council or other governmental forms.

Other factors considered, though not conclusive, are the existence of special appropriation items of the group and the social solidarity of the group.

Felix Cohen, *Handbook of Federal Indian Law* 271 (1942).

Finally, the Miamis cite the recommendations of Task Force Eleven of the American Indian Policy Review Commission as the "last indication of Congress' intent regarding recognition of Indian tribes." According to the Miamis, the Commission's recommendations were based on two premises: "first, that in the Indian Trade and Intercourse Act and other Indian statutes of general application, the Congress intended to recognize all Indian tribes; and second, that the Department of the Interior lacked statutory authority to recognize tribes that had not been specifically recognized by Congress at some point in history."

The Miamis contend that all of these standards are radically different from those imposed by the 1978 regulations and, therefore, violate clear Congressional intent that all Indian tribes be recognized. The Miamis contend that the 1978 regulations impermissibly violated this intent in three ways: (1) the criteria became mandatory, rather than permissive; (2) the burden of proof was increased so that Indian tribes must provide proof from the time of first white contact of a group's Indian identity, community and political influence; and (3) the community requirement was increased dramatically.

As previously discussed, however, Congress has not unambiguously expressed an intent that all Indian tribes be recognized, much less that all groups claiming to be Indian tribes be recognized as such. The report of Task Force Eleven of the American Indian Policy Review Commission does not, as the Miamis contend, serve as an indication of Congressional intent because the report was made for, not by, Congress. Likewise,

case law and past practices of the Department suggesting what constitutes an Indian tribe do not serve as indications that Congress' clear intent was to recognize all Indian tribes.

The court must "not simply impose its own construction on the statute, as would be necessary in the absence of administrative interpretation. Rather, ... the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 843, 104 S.Ct. at 2782. Thus, in this case, the court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

In light of this standard, the court cannot conclude that the Secretary exceeded his statutory authority in promulgating the 1978 regulations. Congress has not manifested an unambiguous intent to recognize all Indian tribes. Congress has delegated authority to the Secretary to prescribe regulations governing Indian affairs and regulations, and pursuant to that authority, the Secretary promulgated the 1978 regulations in an attempt to define what constitutes an Indian tribe. That the Secretary elected to promulgate regulations that allegedly differ from past practices is not enough to render that decision impermissible. The court cannot substitute its own construction of the relevant statutory provisions for a reasonable interpretation made by the Secretary, so the Miamis' claim that the Secretary exceeded his authority simply by changing the standards in 1978 must necessarily fail.

## B.

■ The Miamis also contend that the 1978 regulations are invalid because the Secretary lacks statutory authority to impose any standard other than voluntary abandonment on previously recognized Indian tribes. Generally, the Miamis contend that the tribal abandonment standard governs previously recognized Indian tribes, so that if a tribe can prove lineal descent from the treaty tribe and continuous tribal organization, it is entitled to a presumption of continuous tribal existence. The Miamis cite no statutory authority for what appears to be a court-made doctrine. *See, e.g., The Kansas Indians*, 72 U.S. (5 Wall.) 737, 757, 18 L.Ed. 667 (1866) ("conferring rights and privileges on these Indians cannot affect their situation, which can only be changed by treaty stipulation, or a voluntary abandonment of their tribal organization"); *Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 557 (9th Cir.1991) ("In general, we have continued to recognize tribal existence unless the tribe has voluntarily sought, and achieved, assimilation into non-Indian culture.").

Assuming for the purposes of this motion that the tribal abandonment standard could result in a presumption of continued existence, the court cannot conclude that the 1978 regulations are invalid merely for not explicitly including this standard into their rules. The purpose of the 1978 regulations is to establish a system whereby the Department of the Interior can determine which groups of Indians continue to exist as tribes. Any difference between "tribal abandonment" or "continuous existence" is merely a matter of semantics: if the regulations establish a permissible method for determining that a group continues to exist as an Indian tribe, then the regulations must also implicitly establish a method for determining whether the tribe has been abandoned.

Even if the 1978 regulations foreclosed the presumption of continued existence that the Miamis contend the tribal abandonment standard would afford them, it would not mean that the Secretary exceeded his statutory authority in promulgating them. The tribal abandonment standard is not a legislative creation, and the Secretary was not bound to include it in the regulations unless failure to do so would have been unreasonable.

By July 3, 1978, when the comment period on the second draft of the proposed regulations closed, the Department had held:

[A] total of 400 meetings, discussions and conversations about Federal acknowledgment with other Federal agencies, State government officials, tribal representatives, petitioners, congressional staff members and legal representatives of petition-

ing groups; 60 written comments on the initial proposed regulations of June 16, 1977; a national conference on Federal acknowledgment attended by approximately 350 representatives of Indian tribes and organizations; and 34 comments on the revised proposed regulations published on June 1, 1978.

43 Fed.Reg. 39,361 (1978). The Secretary explicitly stated in the 1978 revised draft of the proposed regulations that "while all the approaches appeared to be viable, there is no single 'best approach.' The following regulations, therefore, are a composite of what we consider to be the best and generally most acceptable thought put forth." *Id.*

Although there is no indication whether the Secretary specifically considered the inclusion of the abandonment standard into the final 1978 regulations, the Secretary made reasonable efforts to include the criteria he deemed necessary. The court will not invalidate the Secretary's reasonable interpretation of the applicable statutes. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 844, 104 S.Ct. at 2782. The Miamis' claim that the Secretary exceeded his authority by not explicitly including the tribal abandonment standard in the 1978 regulations must also fail.

The Secretary did not exceed his statutory authority in promulgating the 1978 regulations. With respect to this claim, the Miamis' motion for summary judgment must be denied, and the defendants' motion for summary judgment must be granted.

### IV.

The Miamis next contend that the 1978 regulations failed to explain the policy issues raised and the policy choices the Secretary made in promulgating the regulations. The Miamis contend that the APA, 5 U.S.C. § 553, required the Secretary "to take certain steps including the incorporation in the regulations of a 'concise general statement of their basis and purpose,'" and that the statement included in the 1978 regulations "is entirely deficient." The Miamis allege several different ways the 1978 regulations' statement of basis and purpose is defective.

The defendants contend that these claims are barred by the applicable six-year statute of limitations for procedural or policy-based attacks on the regulations. *See* 28 U.S.C. § 2401. The defendants previously filed a motion to dismiss Counts 2 and 3 of the complaint making this same contention; the court ruled in July 1994 that the statute of limitations did not bar the claims contained within those counts because they are essentially substantive, rather than procedural, challenges to the 1978 regulations. The Miamis now assert that decision in defense of its claims that the 1978 regulations failed to explain the policy issues raised and the policy choices made by the Secretary.

In its order on the defendants' motion to dismiss, the court relied heavily upon the Ninth Circuit's decision in *Wind River Mining Corp. v. United States*, 946 F.2d 710 (9th Cir.1991), to hold that Counts 2 and 3 of the complaint were substantive challenges to the regulations, and that the six-year statute of limitations thus began to run when the Miamis' petition for acknowledgment was denied in 1992. However, the *Wind River Case* stands for the equally sound principal that:

> If a person wishes to challenge a mere procedural violation in the adoption of a regulation or other agency action, the challenge must be brought within six years of the decision. Similarly, if the person wishes to bring a policy-based facial challenge to the government's decision, that too must be brought within six years of the decision. This result ... would make the most sense.

946 F.2d at 715.

The court does not believe, with respect to the Miamis' contentions concerning "policy issues raised and the policy choices made," that it is bound by its earlier denial of the defendants' motion to dismiss. That decision was based entirely upon a reading of the complaint and the parties' briefs; the parties' summary judgment motions were not before the court. The Miamis' complaint and briefs on the motion to dismiss did not suggest that they intended to raise issues concerning the "policy issues raised and the policy choices made" by the Secretary or concerning the

sufficiency of the statement of basis and purpose.

These contentions are either a challenge to procedural violations in the adoption of the regulations or a policy-based facial challenge to the government's decisions. As such, they should have been brought within six years of the promulgation of the regulations. *Wind River Mining Corp. v. United States,* 946 F.2d at 715. Therefore, leaving aside any issues concerning whether the Miamis could actually bring these contentions under the complaint as written, the applicable statute of limitations bars such contentions.

## V.

The Miamis next contend that the Secretary acted arbitrarily, capriciously, and without rational basis in promulgating the 1978 regulations. The Miamis bring this contention under 5 U.S.C. § 706(2)(A) of the APA, which limits the court's review of the regulations promulgated under 5 U.S.C. § 553 to whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Under this standard, "a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choices made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an im-portant aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

The Miamis contend that the 1978 regulations are arbitrary and capricious under this standard because they (1) change the criteria that were previously used to recognize tribes without explaining the change in policy; (2) do not provide petitioners or decisionmakers with sufficient guidance in preparing or reviewing petitions because they do not define key terms or specify a burden of proof; and (3) do not provide for a formal hearing including the opportunity to cross-examine the government's experts or for an independent review of the government's final determination.

## A.

▮ The Miamis first contend that the 1978 regulations are arbitrary and capricious because they changed the criteria that were previously used to recognize tribes and fail to explain the change in policy, citing *Local 777, Democratic Union Organizing Committee v. National Labor Relations Board,* 603 F.2d 862, 882 (D.C.Cir.1978) ("Although an agency may change its policy ... when, as here it announces no principled reason for such a reversal, its action is arbitrary and capricious."), and *National Labor Relations Board v. Indianapolis Mack Sales and Service, Inc.,* 802 F.2d 280, 284 (7th Cir.1986) ("When an agency changes course, a reviewing court must be satisfied that the agency was aware of, and has given sound reasons for, the change, and that it has shown that the new rule is consistent with the statutory duties."). The Miamis also contend that the change in policy creates a possibility of disparate treatment of similarly situated groups that is arbitrary and capricious, citing *Keen Transport, Inc. v. United States,* 446 F.Supp. 5, 8 (N.D.Ohio 1976).

The Miamis' primary complaint is that under the 1978 regulations, the criteria became mandatory rather than permissive, the burden of proof was increased so that Indian

**1172**

tribes must provide proof from the time of first white contact of a group's Indian identity, community and political influence, and the community requirement was increased dramatically. The defendants dispute whether any of these components of the 1978 regulations actually constitute a change in policy.

Before 1978, the Department considered acknowledgment requests on a case-by-case basis. The defendants agree with the Miamis that those determinations were made taking into consideration, among other things, the criteria outlined by Felix Cohen in the *Handbook of Federal Indian Law,* as previously discussed. An increase in the number of acknowledgment requests in the 1970's "necessitate[d] the development of procedures to enable the Department to take a uniform approach in their evaluation." 43 Fed.Reg. 39,361 (1978). Thus, through an informal rulemaking procedure pursuant to 5 U.S.C. § 553 of the APA, the Department promulgated the 1978 regulations to serve this goal.

Viewing the 1978 regulations as a whole, the court cannot conclude, as the Miamis contend, that they are arbitrary and capricious because of unannounced changes in policy. The court is hesitant to conclude that the 1978 regulations constitute the type of reversal in Department policy envisioned by the case law cited by the Miamis. *Local 777 v. NLRB,* 603 F.2d at 882, and *NLRB v. Indianapolis Mack,* 802 F.2d at 284, both involved decisions by the National Labor Relations Board that ran counter to "longstanding rules" as applied by the Board. In contrast, this case involves the initial promulgation of regulations in a field that was devoid of uniform rules. Certainly, to the extent that the Department previously had no official, uniform policy for making acknowledgment determinations, the 1978 regulations constitute a change in policy. Policy decisions do not become unannounced policy changes, however, simply because the Secretary elects to require satisfaction of all the enumerated criteria or to require proof of continuous existence and community identity.

Both parties agree that before the promulgation of the 1978 regulations, acknowledgment determinations were made on an ad hoc basis. In addition, the defendants have demonstrated that all of the components to which the Miamis now object appeared in various prior acknowledgment decisions made by the Department. Finally, the record reflects that the Department took into consideration many of the comments received by it during the informal rulemaking process and included suggestions made in many of those comments in the 1978 regulations. As such, the court finds that the 1978 regulations are not arbitrary and capricious because of an unannounced change in policy.

**B.**

The Miamis also contend that the regulations are arbitrary and capricious because they do not provide petitioners or decisionmakers with sufficient guidance in preparing or reviewing petitions because they fail to define key terms and fail to specify a burden of proof. The Miamis argue that the following terms are vague and undefined: "maintained tribal relations" in 25 C.F.R. § 83.1(k); "maintenance of tribal relations" in § 83.1(*o*); "substantially" and "substantial" in §§ 83.3(a), 83.7(a) and 83.7(b); "reasonable proximity" in § 83.1(*o*); "specific area" in § 83.7(b); and "tribal political influence" in § 83.7(c). The Miamis also contend that the regulations do not explain the level of proof necessary to establish facts or criteria under the regulations.

The Miamis merely state that these alleged failures are arbitrary and capricious; they do nothing more to convince the court to so conclude. Under the arbitrary and capricious standard, the court must "determine whether the agency's determination 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Head Start Family Education Program, Inc. v. Cooperative Educational Service Agency 11,* 46 F.3d 629, 633 (7th Cir.1995) (quoting *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. at 43, 103 S.Ct. at 2866–2867). The court already has determined that the Department extensively considered the relevant factors and comments when promulgating the 1978 regulations.

The court cannot impose its own policy choices when those choices are left to the Secretary's discretion. *See, e.g., American Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1298–99 (7th Cir.1985). The regulations are not arbitrary and capricious simply because the Miamis contend that a few terms are vague or because the burden of proof is unclear.

## C.

■ Finally, the Miamis contend that the regulations are arbitrary and capricious because they do not provide for a formal hearing, including the opportunity to cross-examine the government's experts, or for an independent review of the government's final determination. The division within the Department that processes all recognition petitions is the Bureau of Indian Affairs ("BIA"). Within the BIA, the petitions are extensively reviewed by the Branch of Acknowledgment and Research ("BAR") by a team of historians, anthropologists and genealogists. The Miamis contend that because the initial review and acknowledgment determination is made in the BAR by these experts, the review process is essentially hidden from the petitioner and that the petitioner should thus be afforded a hearing with an opportunity to cross-examine the BAR experts who worked on the petition.

The Miamis cite *Wallace v. Bowen*, 869 F.2d 187, 192 (3rd Cir.1988), in support of this theory that failure to provide for cross-examination renders the regulations arbitrary and capricious. *Wallace v. Bowen* is distinguishable, however, because in that case the court interpreted the regulations in light of the statute authorizing its promulgation and determined that "it is unmistakable under the statute that the Secretary may not rely on post-hearing reports without giving the claimant an opportunity to cross-examine the authors of such reports, when such cross-examination may be required for a full and true disclosure of the facts." 869 F.2d at 192 (interpreting 42 U.S.C. § 405(b)(1)).

An examination of the statutes that authorized the 1978 regulations does not reveal an intent on the part of Congress to require a hearing and opportunity for cross-examination. The 1978 regulations were promulgated under the informal rulemaking procedure pursuant to 5 U.S.C. § 553 of the APA:

> The Administrative Procedure Act makes clear that notice of the scope and general thrust of the proposed rule, and an opportunity to submit written comments, are all the procedure that an agency engaged in "informal rulemaking" is required to provide. An evidentiary hearing is not required.

*United Air Lines, Inc. v. Civil Aeronautics Board*, 766 F.2d 1107, 1116 (7th Cir.1985).

The Miamis suggest many valid reasons why a hearing and opportunity for cross-examination may be preferable in this instance, and refer the court to testimony from past BAR employees who have suggested the same. The Miamis submit the written testimony of three former BAR employees submitted to the House Subcommittee on Native American Affairs in 1994, which indicate, among other things, that because the BAR employees who review recognition petitions have no guidance with respect to how to make their determinations, petitioning groups should be afforded an evidentiary hearing and an opportunity to cross-examine witnesses. *See, e.g.,* Testimony of Karen Cantrell, July 22, 1994, Plaintiffs' Exh. 4.

The court is not to impose its own policy choices upon the regulations, however; the court's review is limited to whether the regulations are arbitrary and capricious. Because the APA does not mandate a hearing and opportunity for cross-examination, and because Congress has not manifested an intent to provide such procedures, the absence of a provision for such procedures does not render the 1978 regulations arbitrary and capricious under 5 U.S.C. § 706(2)(A).

The 1978 regulations have been promulgated in accordance with law and are not arbitrary, capricious or without rational basis. *See* 5 U.S.C. § 706(2)(A). The Miamis' motion for summary judgment must be denied, and the defendants' motion for summary judgment must be granted, with respect to this claim.

**1174**

## VI.

The Miamis' last claim is that the 1978 regulations do not meet constitutional requirements. The Miamis contend that the regulations do not afford petitioners procedural due process, that the regulations violate substantive due process, and that the regulations violate the equal protection component of the Fifth Amendment.

## A.

■ The Miamis first contend that the 1978 regulations do not afford groups petitioning for acknowledgment procedural due process. "Before [the Miamis] may assert a due process claim, be it procedural or substantive, [they] must establish that [they] have a 'legitimate claim of entitlement' to the right being asserted." *Harris v. City of Auburn*, 27 F.3d 1284, 1285–86 (7th Cir.1994) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

The Miamis do not contend in this argument that their procedural due process rights were violated as a result of the Department's decision to not acknowledge their existence as an Indian tribe. Rather, the Miamis contend that the 1978 regulations are violative of procedural due process on their face. To support this contention, the Miamis argue that any Indian tribe applying for recognition under the 1978 regulations has an entitlement because the regulations set specific criteria and restrict the discretion of the decisionmaker. *See* 25 C.F.R. § 83.9(i) (the Secretary "shall acknowledge the existence of the petitioner as an Indian tribe when it is determined that the group satisfies the criteria in § 83.7.").

With respect to what constitutes a legitimate claim of entitlement protected by due process, the Seventh Circuit has stated:

This circuit has on occasion been guided by Judge Hufstedler's definition of "legitimate claim of entitlement." *See Geneva Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483, 495–96 (9th Cir.1974) (Hufstedler, J., dissenting) ("An entitlement is a legally enforceable interest in receiving a governmentally conferred benefit, the initial receipt or termination of which is conditioned upon the existence of a controvertible and controverted fact.") As reformulated by this court, the rule states that a "legitimate claim of entitlement is created only when the statutes or regulations in question establish a framework of factual conditions delimiting entitlement which are capable of being explored at a due process hearing." *Eidson v. Pierce*, 745 F.2d 453, 459–60 (7th Cir.1984). More plainly, it means "an entitlement that stands or falls on the application of rules to facts." *Scott v. Village of Kewaskum*, 786 F.2d 338, 339–40 (7th Cir. 1986).

*Cornelius v. LaCroix*, 838 F.2d 207, 210 (7th Cir.1988).

When discussing due process under the Fourteenth Amendment, the Seventh Circuit has stated that it will find a liberty interest in a state statute or regulation

only if the state's statute or regulation uses "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will' or 'must' be employed," and contains substantive standards or criteria for decisionmaking as opposed to vague standards that leave the decisionmaker with unfettered discretion.

*Kraushaar v. Flanigan*, 45 F.3d 1040, 1048 (7th Cir.1995) (quoting *Hewitt v. Helms*, 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983), and citing *Miller v. Henman*, 804 F.2d 421, 427 (7th Cir.1986), *cert. denied*, 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987)).

However, "[t]he Supreme Court has 'never held that applicants for benefits, as distinct from those already receiving them, have a legitimate claim of entitlement protected by the Due Process Clause.'" *Dehainaut v. Pena*, 32 F.3d 1066, 1074 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1427, 131 L.Ed.2d 309 (1995) (quoting *Lyng v. Payne*, 476 U.S. 926, 942, 106 S.Ct. 2333, 2343, 90 L.Ed.2d 921 (1986)). Indeed, the Seventh Circuit has "repeatedly rejected the notion that any and all state ... rules and regulations containing such language automatically create 'legitimate claims of entitlement' triggering the procedural protections of the due

process clause." *Colon v. Schneider,* 899 F.2d 660, 667 (7th Cir.1990). Instead, "[s]ome statutes and regulations create only guidelines that direct the manner in which state personnel exercise their discretion to perform certain activities. These types of guidelines do not create substantive rights or legally enforceable expectancies." *Kraushaar v. Flanigan,* 45 F.3d at 1048 (citing *Miller v. Henman,* 804 F.2d at 424).

The court must look to the regulations to determine whether a legitimate claim of entitlement has been established. *Thornton v. Barnes,* 890 F.2d 1380, 1386 (7th Cir.1989). Under the standards just discussed, the 1978 regulations do not create a legitimate claim to entitlement. As the Miamis contend, § 83.9(i) of the 1978 regulations states that the Assistant Secretary "shall acknowledge the existence of the petitioner as an Indian tribe when it is determined that the group satisfies the criteria in § 83.7." 25 C.F.R. § 83.9(i). The mandatory nature of this language suggests that if the Assistant Secretary has found that the petitioning group has satisfied all of the criteria in § 83.7, the Assistant Secretary has no discretion to refuse to extend federal recognition to the petitioner.

The regulation cited by the Miamis, however, does not restrict the Assistant Secretary's discretion to determine whether those factors have been met. For example, § 83.9, which governs the Department's processing of a group's petition for acknowledgment, also states that:

Upon receipt of a petition, the Assistant Secretary shall cause a review to be conducted to determine whether the petitioner is entitled to be acknowledged as an Indian tribe. The review shall include a consideration of the petition and supporting evidence, and the factual statements contained therein. The Assistant Secretary may also initiate other research by his

staff, for any purpose relative to analyzing the petition and obtaining additional information about the petitioner's status, and may consider any evidence which may be submitted by other parties.

25 C.F.R. § 83.9(a). This language provides the Assistant Secretary, when applying the criteria to a petitioner, discretion both to view evidence from various sources and to initiate supplementary research. Although the Assistant Secretary has no discretion to refuse federal recognition once he has determined that the § 83.7 criteria have been met, the Assistant Secretary nonetheless is vested with discretion to determine whether those criteria have been met. Therefore, the 1978 regulations do not create a legitimate claim to entitlement protected by due process.[4]

Accordingly, the Miamis' motion for summary judgment must be denied, and the defendants' motion for summary judgment must be granted, as to the Miamis' procedural due process claim.

### B.

 The Miamis also contend that the 1978 regulations violate substantive due process. While procedural due process assures fair procedure in the decision-making process, substantive due process "is concerned with the decision itself." *Employers Insurance of Wausau v. Browner,* 848 F.Supp. 1369, 1377 (N.D.Ill.1994) (quoting *Universal Security Insurance Co. v. Koefoed,* 775 F.Supp. 240 (N.D.Ill.1991)). The Seventh Circuit has stated that to establish a substantive due process claim, "in addition to alleging that the decision was arbitrary and irrational, 'the plaintiff must also show either a separate constitutional violation or the inadequacy of state law remedies.'" *New Burnham Prairie Homes v. Village of Burnham,* 910 F.2d 1474, 1481 (7th Cir.1990) (citations omitted); *see also Employers Insurance of Wausau v. Browner,* 848 F.Supp. at 1377 n.

---

4. In support of their procedural due process arguments, the Miamis rely heavily upon the court's opinion in *Greene v. Lujan,* No. C89–645Z, 1992 WL 533059, 1992 U.S.Dist.LEXIS 21737 (W.D.Wash. Feb. 25, 1992). That case is distinguishable, however, because the court concluded that the plaintiff had a protected property interest solely because its members had been

receiving federal benefits until a series of statutes were passed in the 1970's requiring federal recognition as a prerequisite to receiving benefits; the court did not discuss whether the 1978 regulations created a legitimate claim to entitlement. Additionally, the court previously had concluded that the 1978 regulations were not unconstitutional on their face.

14 (although *New Burnham* dealt with state-based property rights, "there is no reason that the Seventh Circuit's requirements would not apply equally to claims based upon federal law").

The Seventh Circuit has expressed reluctance in expanding substantive due process jurisprudence. *See, e.g., National Paint & Coatings Association v. City of Chicago,* 45 F.3d 1124, 1129 (7th Cir.1995) ("Now we have spent some time looking through the Constitution for the Substantive Due Process Clause without finding it."); *Illinois Psychological Ass'n v. Falk,* 818 F.2d 1337, 1342 (7th Cir.1987) (noting the "oxymoron of substantive due process"). Indeed, "[t]he fact that it is a doctrine owing its existence to constitutional structure rather than a clear grant of power to the judiciary has led the Supreme Court to be cautious in its use." *National Paint & Coatings Association v. City of Chicago,* 45 F.3d at 1129 (citing *Albright v. Oliver,* —— U.S. ——, —— – ——, 114 S.Ct. 807, 812–13, 127 L.Ed.2d 114 (1994) (plurality opinion)). The Miamis' sole ground for their substantive due process contention is that regulations that have been found to be arbitrary and capricious must also violate substantive due process. Having previously found that the 1978 regulations are not arbitrary and capricious under 5 U.S.C. § 706(2)(A), the court concludes that the 1978 regulations do not violate substantive due process.

With respect to this claim, the Miamis' motion for summary judgment must be denied, and the defendants' motion for summary judgment must be granted.

### C.

▮▮▮▮ The Miamis' final contention in their summary judgment motion is that the 1978 regulations violate equal protection. The Miamis contend that the 1978 regulations violate equal protection "by imposing more onerous standards to petitions for acknowledgment processed after 1978 than those processed before 1978." The Miamis assert that the 1978 regulations must undergo strict scrutiny because they "impact on non-federally recognized tribes' freedom of association." The Seventh Circuit holds that "in order to assert a constitutional claim based on violation of equal protection, a complaining party must assert disparate treatment based on their membership in a particular group." *New Burnham Prairie Homes v. Village of Burnham,* 910 F.2d at 1481.

The Miamis' equal protection claim must fail as a matter of law. The court cannot agree that the 1978 regulations are subject to strict scrutiny because they impinge upon the freedom of association rights of non-federally recognized tribes. Certainly, as the Miamis contend, non-recognition carries a heavy price for a petitioning group because the group will be ineligible for many government benefits. This negative impact of non-recognition does not mean, however, that the 1978 regulations affect the freedom of association rights of those groups.

The court need only determine whether the

> classification is irrational, invidious, or otherwise predicated on impermissible criteria: "If the government classification relates to a proper governmental purpose, then the classification will be upheld.... Those who are treated less favorably by the legislation are not denied equal protection of the law because they are not similarly situated to those who receive the benefit of the legislative classification."

*Hassan v. Wright,* 45 F.3d 1063, 1068 (7th Cir.1995) (quoting Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law, Substance and Procedure* § 18.2 at 7 (2nd ed. 1992)). When reviewing class distinctions not pertaining to a fundamental right or a suspect class, the court's "review is limited to determining whether the statute is rationally related to legitimate legislative goals." *Lindley v. Sullivan,* 889 F.2d 124, 132 (7th Cir.1989); *see also Hassan v. Wright,* 45 F.3d at 1068.

The 1978 regulations withstand this minimum scrutiny. The 1978 regulations were promulgated with the legitimate purpose of standardizing the process for federal recognition of Indian tribes. The Miamis merely contend that the regulations are not rationally related to that goal because they impose stricter standards after 1978 than before

1978. Of course, as previously discussed, decisions with respect to tribal recognition before the promulgation of the 1978 regulations were made on an ad hoc basis. The court already has concluded that the regulations are in accordance with law and are not arbitrary, capricious, or without rational basis. Consistent with that finding, the court finds that the 1978 regulations are rationally related to a legitimate government purpose, and therefore comport with equal protection. *See Lindley v. Sullivan,* 889 F.2d at 132.

Accordingly, with respect to this claim, the Miamis' motion for summary judgment must be denied, and the defendants' motion for summary judgment must be granted.

## VII.

■ Contending that the defendants have not produced certain items in the administrative record, the Miamis also seek an order directing the government to complete the administrative record. Contending that the Miamis failed to comply with District Rule 37.1, the defendants filed a motion to strike or deny the Miamis' motion for an order directing the government to complete the administrative record. Alternatively, the defendants seek an extension of time to respond to the plaintiffs' motion.

District Rule 37.1 specifically states that:

The court may deny any discovery motion ... unless counsel for the moving party files with the court, at the time of filing the motion, a separate statement showing that the attorney making the motion has made a reasonable effort to reach agreement with opposing attorney(s) on the matter(s) set forth in the motion.

The statement shall recite, in addition, the date, time, and place of such conference and the names of all parties participating therein....

N.D.Ind.L.R. 37.1. *See also* Fed.R.Civ.P. 37(a)(2)(B).

The Miamis contend that their motion is not actually a discovery motion, but rather is a motion "to direct the government to complete an obviously deficient administrative record." The defendants contend that the motion is truly a discovery motion because it requests permission to conduct additional discovery and essentially requests the court to compel the defendants to produce any documents that have not yet been produced but belong in the administrative record. The defendants further contend that "[t]he obvious purpose of L.R. 37.1 is to force discovery dispute resolution and avoid wasting the Court's (and the parties') time with wasteful motions practice on otherwise soluble matters."

The court agrees with both of the defendants' contentions. Although the Miamis' motion is not fashioned as a discovery motion, the relief it seeks reveals that, in essence, it constitutes the type of motion governed by District Rule 37.1—that is, "any discovery motion." Further, the court agrees that the purpose of District Rule 37.1 is to require the parties to at least attempt resolution of discovery disputes before bringing them to the court for disposition. In light of the many indications the defendants have made in their motion to strike and in their reply brief that they are willing to discuss the issues raised by the Miamis, it does not appear that compliance with District Rule 37.1 would be an act of futility. Thus, the court grants the defendants' motion to strike the Miamis' motion for an order directing the government to complete the administrative record. The Miamis' motion for an order directing the government to complete the administrative record is stricken, without prejudice to refile exhibiting compliance with District Rule 37.1.

## VIII.

In conclusion, the court:

(1) DENIES the plaintiffs' motion for partial summary judgment (filed August 1, 1994 (# 93));

(2) GRANTS the defendants' motion for partial summary judgment (filed October 5, 1994 (# 104));

(3) DENIES the plaintiffs' motion for a hearing (filed August 1, 1994 (# 92));

(4) GRANTS the defendants' motions to strike or deny plaintiffs' motion for discovery (filed January 9, 1995 (# 116–1)) and DENIES AS MOOT the defendants' alter-

native motion to extend time to respond to the plaintiffs' motion for discovery (filed January 9, 1995 (# 116–2)); and

(5) STRIKES the plaintiffs' motion for an order directing the government to complete the administrative record (filed December 27, 1994 (# 113)), without prejudice to refile exhibiting compliance with Local Rule 37.1.

SO ORDERED.