**CHEROKEE NATION OF OKLA-HOMA, on behalf of all its members, Plaintiff,**

v.

**Gale NORTON, in her official capacity as Secretary of Interior of the United States Department of Interior; Neal McCaleb, in his capacity as Assistant Secretary of the Department of the Interior; and the Delaware Tribe of Indians, as an indispensable party pursuant to Federal Rule of Civil Procedure 19, Defendants.**

No. 98–CV–903–H.

United States District Court,
N.D. Oklahoma.

July 23, 2002.

See also 2002 WL 31911072.

Julian Kroh Fite, David Alan Mullon, Jr., Janice Walters Purcell, Cherokee Nation of Oklahoma Division of Law & Justice, Tahlequah, OK, F. Browning Pipestem, Dena LaMoyne Silliman, F. Browning Pipestem & Associates, Norman, OK, James Hamilton, William J. Mertens, Wilson K. Pipestem, Swidler & Berlin Chartered, Lloyd B. Miller, Sonosky Chambers Sachse Miller & Munson, Anchorage, AK, for Plaintiff.

Phil Pinnell, Loretta F. Radford, Tulsa, OK, Rollin Anthony Rogers, US Department of Justice Environment & Natural Resources Washington, DC, Barbara Coen, US Dept of Interior Division of Indian Affairs, Washington, DC, for Defendant.

## ORDER

HOLMES, District Judge.

This matter comes before the Court on motions by each of the parties with respect to a decision by the Secretary of Interior (the "Secretary") in 1996 to withdraw a letter issued by an official in the Department of Interior (the "Department") in 1979 (the "1979 letter"). The effect of such withdrawal was to re-establish certain dealings between the United States and the Delaware Tribe of Indians. For the reasons set forth below, the Court finds that the Secretary's withdrawal of the 1979 letter should be upheld as an appropriate exercise of the Secretary's authority. The Court further finds, however, that this determination may not resolve all the issues

in this case and that additional questions must be addressed as described more fully herein below.

## I

The procedural facts that form the basis of the present action were set forth in Federal Defendants' Response Brief to Plaintiff's Opening Brief and were not properly contested by Plaintiff.[1] Based upon this statement of facts and the administrative record in this case, the Court finds as follows:

1. In 1992, the Delaware Tribe of Indians undertook to have the Assistant Secretary–Indian Affairs review the actions taken by an official in the Department in 1979. AR 6 0002.

2. The 1979 position of the Department was that the 1958 bylaws of the Delaware Tribe did not establish "a relationship with the Federal Government separate from that of the Cherokee Nation." AR 1 0105.

3. The 1979 position did not include an analysis of the historical direct government-to-government dealings with the Delaware Tribe. AR 1 0100—106.

4. The Department followed the 1979 position until 1996. AR 1 0008.

5. On February 23, 1993, the Office of Tribal Services, Bureau of Indian Affairs, requested the Associate Solicitor, Indian Affairs, to provide an opinion concerning "Delaware–Cherokee relations." AR 6 0003.

6. In 1994, the Delaware Tribe submitted a revised document to the Department of the Interior entitled "A Lesson in Administrative Termination: An Analysis of the Legal Status of the Delaware Tribe of Indians." AR 2 0002 *et seq.*

7. In response to receiving this Delaware Tribe submission, the Cherokee Nation presented its position to the Department on September 6, 1994. AR 6 0018.

8. Following a preliminary review of the documents submitted and a preliminary review of additional files at the Department, including documents submitted previously by the Cherokee Nation, the Acting Associate Solicitor, Indian Affairs, requested the Cherokee Nation to submit any additional information that it wanted the Department to consider. AR 6 0062.

9. The Cherokee Nation, on July 19, 1995, submitted additional comments: "The Legal Status of the Delawares vis a vis Cherokee Nation." AR 3 0002 *et seq.*

10. The Associate Solicitor, Indian Affairs, prepared a memorandum to the Assistant Secretary, Indian Affairs, dated June 19, 1996. AR 1 0007 *et seq.*

11. The Associate Solicitor's memorandum included an analysis of the historical documents, administrative practice, and all comments submitted by the Delaware Tribe and Cherokee Nation. AR 1 0007 *et seq.*

12. The memorandum concluded that the position taken in 1979 should be reconsidered because independent government-to-government dealings with the Delaware Tribe "more accurately reflects the appropriate legal interpretation of the treaties and agreements from the 1860's and more accurately reflects the bulk of the administrative practice." AR 1 0008.

---

**1.** The Court notes that Plaintiff did not controvert the Federal Defendants' statement of facts in the manner prescribed by the Local Rules. Moreover, at the hearing on January 25, 2002, Plaintiff did not challenge Defendants' statement of facts. Only later, on January 29, 2002, did Plaintiff undertake to contest Defendants' statement of facts. This filing, however, was both untimely and not in compliance with the Local Rules. Accordingly, this filing (Docket No. 110) is hereby stricken.

13. The Assistant Secretary, Indian Affairs, approved the Associate Solicitor's memorandum on June 26, 1996. AR 1 0006.

14. On June 27, 1996, the *Federal Register* published notice of the Assistant Secretary, Indian Affairs', proposed decision to retract "the position of the Department stated in the 1979 letter," because that position "did not consider the entire relevant legal record and did not construe accurately the provisions of the 1866 Treaty with the Delaware and the 1867 Agreement between the Delaware and Cherokee." AR 1 0004.

15. The Assistant Secretary, Indian Affairs, accepted comment on this proposed action. AR 1 0004.

16. Public comment was submitted but none of the comments addressed the analysis presented in the Assistant Secretary's preliminary decision. AR 1 0117 *et seq.*

17. The Cherokee Nation's comment was slightly over one page in length and stated that "if the Delawares can concede that their actions will not result in any diminishment of the Cherokee Nation's present funding, its service area or jurisdictional base then separate recognition would be agreeable to the tribe." The Cherokee Nation did not object to the analysis presented in the Assistant Secretary's preliminary decision and did not suggest an alternative analysis. AR 1 0118–19.

18. On September 23, 1996, the Assistant Secretary decided that based on the comprehensive legal review conducted by the Division of Indian Affairs, and based on a review of the comments received from the public, the Department would retract the position taken by the Department in 1979 and restore direct dealings with the Delaware Tribe of Indians. The Department would continue its government-to-government dealings directly with the Delaware Tribe of Indians. The Assistant Secretary gave notice that the Delaware Tribe of Indians was a tribal entity recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of its status as an Indian tribe. AR 1 0110 *et seq.*

19. The Assistant Secretary's decision addressed each of the public comments received. AR 1 0110–11.

20. The Assistant Secretary found that "there is nothing in these comments which indicates that the basis of the proposed decision is in error or that the legal analysis of June 19, 1996, includes errors or is incomplete. These comments, therefore, do not merit a change in the proposed decision." AR 1 0111.

21. The Assistant Secretary concluded that the Delaware Tribe of Indians "will have the same rights to demand consultation and contracting as other tribes. As a separate sovereign the Delaware Tribe of Indians will have the same legal rights and responsibilities as other tribes, consistent with federal law, both as to jurisdiction and as to its rights to define its membership." AR 1 0111.

22. The Assistant Secretary concluded that "[t]his decision in effect clarifies the government-to-government relationship between the United States and the Delaware Tribe of Indians which was understood to exist before the May 1979 letter." AR 1 0111.

23. The Assistant Secretary provided that "[t]he notice of proposed decision, 61 FR 33534, is hereby made final." AR 1 0111

24. Notice of the decision was published in the *Federal Register,* 61 Fed.Reg. 50, 862 (Sept. 27, 1996). AR 1 0110–11.

## II

At the outset, the Court must determine whether, and to what extent, deference to the Secretary's decision to withdraw the 1979 letter is appropriate. It is settled law that when Congress has "explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843–844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and any ensuing regulation is binding on the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute. *See id.* at 844, 104 S.Ct. 2778; *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 81 L.Ed.2d 680 (1984); Administrative Procedures Act ("APA"), 5 U.S.C. §§ 706(2)(A), (D) (1996). But whether or not an agency enjoys an express delegation of authority on a particular question, an agency charged with applying a statute necessarily makes all sorts of interpretive choices, and, while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered. "[T]he well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance,'" *Bragdon v. Abbott,* 524 U.S. 624, 642, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139–140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)), and "[the Supreme Court has] long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ...." *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778 (footnote omitted); *see also Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Zenith Radio Corp. v. United States,* 437 U.S. 443, 450, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).

The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care,[2] its consistency,[3] formality, and relative expertness,[4] and to the persuasiveness of the agency's positions. *See Skidmore,* 323 U.S. at 139–140, 65 S.Ct. 161. The approach has produced a spectrum of judicial responses, from great respect at one end, *see, e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 389–390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984) (giving "'substantial deference'" to administrative construction), to near indifference at the other, *see, e.g., Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 212–213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (evaluating an interpretation advanced for the first time in a litigation brief). As Justice Jackson stated:

> The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those

---

2. *See, e.g., General Elec. Co. v. Gilbert,* 429 U.S. 125, 142, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (courts consider the "'thoroughness evident in [the agency's] consideration'" (quoting *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161)).

3. *See, e.g., Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due.").

4. *See, e.g., Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.,* 467 U.S. 380, 390, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984).

factors which give it power to persuade, if lacking power to control.

*Skidmore,* 323 U.S. at 140, 65 S.Ct. 161.

In *Chevron,* the Court recognized that Congress not only engages in express delegation of specific interpretive authority, but that "[s]ometimes the legislative delegation to an agency on a particular question is implicit." 467 U.S. at 844, 104 S.Ct. 2778. Congress, that is, may not have expressly delegated authority or responsibility to implement a particular provision or fill a particular gap. Yet, it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which "Congress did not actually have an intent" as to a particular result. *Id.* at 845, 104 S.Ct. 2778. When circumstances implying such an expectation exist, a reviewing court has no business rejecting an agency's exercise of its generally conferred authority to resolve a particular statutory ambiguity simply because the agency's chosen resolution seems unwise, *see id.* at 845–846, 104 S.Ct. 2778, but is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable, *see id.* at 842–845, 104 S.Ct. 2778; *cf.* 5 U.S.C. § 706(2) (a reviewing court shall set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

The Supreme Court has recognized that a good indicator of delegation meriting *Chevron* treatment is express congression-al authorization to engage in the process of rulemaking or adjudication. *Cf. EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 257, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (no *Chevron* deference to agency guideline where congressional delegation did not include the power to " 'promulgate rules or regulations' ") (quoting *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976)). It is fair to assume generally that Congress contemplates administrative action with the effect of law where, as here, the agency provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. *See Smiley v. Citibank (South Dakota), N.A.,* 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (noting the deference due to actions taken pursuant to APA notice-and-comment procedures "designed to assure due deliberation"). Thus, a significant majority of cases applying *Chevron* deference have reviewed administrative actions resulting from notice and comment proceedings.[5]

■ Before according *Chevron* deference, the Court must first determine whether "Congress delegated authority to the agency generally [to make such determinations] carrying the force of law," and whether "the agency interpretation claiming deference was promulgated in the exercise of [that] authority." *United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

■ In the instant case, it is clear that Congress has delegated broad authority to the Department to manage "all Indian affairs and . . . all matters arising out of

---

5. The Court notes that in the present case, Plaintiff was given notice and opportunity to be heard prior to the Secretary's final decision to retract the 1979 letter. While this is not formal administrative rulemaking, the principles of fairness and deliberation apply to the instant process with equal force.

Indian relations," as well as authority to promulgate regulations having the force and effect of law.[6] The 1866 Treaty with the Cherokee, the 1867 Agreement, and the statutes and regulations relied on by the Cherokee Nation in its Amended Complaint all explicitly concern or regulate Indian affairs. The Department's interpretation of these authorities therefore "come[s] within the area of Indian affairs and relations," and may be entitled to *Chevron* deference. *Miami Nation of Indians of Indiana, Inc. v. Babbitt,* 887 F.Supp. 1158, 1165 (N.D.Ind.1995) (quotation omitted).

■ *Chevron* requires a two-step analysis: first, the Court must determine "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842, 104 S.Ct. 2778. If not, the Court must then examine whether the agency's interpretation is reasonable and consistent with the purposes of the law. *Id.* at 844–45, 104 S.Ct. 2778. If the authority under scrutiny is ambiguous and the agency's interpretation is reasonable, the agency's interpretation *must* be accepted. *Id.* at 842–844, 104 S.Ct. 2778; *see also Christensen v. Harris County,* 529 U.S. 576, 586–87, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)

(noting that "[i]n *Chevron,* we held that a court *must* give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute" (emphasis added)).

The Court notes that the Tenth Circuit has held that the canon of construction that ambiguities are to be resolved in favor of Native Americans controls over the deference otherwise afforded administrative agencies under *Chevron. See Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455, 1462 (10th Cir.1997). However, the Tenth Circuit and other courts have also held that this canon is inapplicable when "the [competing] interests at stake both involve Native Americans."[7] Thus, this canon of construction is inapplicable here because the instant case involves judicial review of a Federal agency decision that hinged in part on the interpretation of Federal laws and a federally-approved agreement affecting competing Native American interests.

■ In addition to *Chevron* deference, the Secretary's interpretations are also entitled to consideration for deference under *Skidmore.* The deference afforded agency interpretations and decisions under *Skidmore* is separate and distinct from *Chevron* deference. As the Supreme Court

---

**6.** *See* 25 U.S.C. § 1 (establishing position of Commissioner of Indian Affairs within the Department of Interior), § 2 (delegating to Commissioner of Indian Affairs "the management of all Indian affairs and of all matters arising out of Indian relations"), § 9 (delegating to the President the power to "prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs"); *see also Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 57 (2d Cir.1994) (surveying history of Congressional delegation of power to administer Indian affairs to executive branch); 43 U.S.C. § 1457 (charging the Secretary with the supervision of public business relating to Indians). More recently, much of the Secretary's authority for the conduct of federal Indian policy has been delegated to

the Assistant Secretary of Indian Affairs. *See* 209 Dept. Manual 8.1.

**7.** *See Utah v. Babbitt,* 53 F.3d 1145, 1150 (10th Cir.1995) (*citing Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n. 7, 96 S.Ct. 1793, 48 L.Ed.2d 274 (1976) ("[This] canon has no application here; the contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members.")); *Confederated Tribes of Chehalis Indian Reservation v. Washington,* 96 F.3d 334, 340 (9th Cir.1996) ("The government owes the same trust duty to all tribes, including the Quinault .... We cannot apply the canons of construction for the benefit of the [Chehalis Tribe] if such application would adversely affect Quinault interests.")

recently clarified, "an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency ... and given the value of uniformity in its administrative and judicial understandings of what a national law requires ...." *Mead Corp.*, 533 U.S. at 234, 121 S.Ct. 2164 (quotation omitted).

### III

The above authorities make clear that some degree of deference is appropriate in this case. The extent of such deference, however, must be measured by the fact that Defendants are seeking to retract a position previously announced in 1979. Indeed, Plaintiff argues that the Secretary's change of position in this case should preclude any deference whatsoever.

 It is well-settled that *Chevron* deference does not control where an agency's interpretation of its regulations is inconsistent with its own prior administrative interpretations. *Shoshone Indian Tribe v. Hodel*, 903 F.2d 784, 787 (10th Cir.1990); *cf. Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)) (quoting *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 68 L.Ed.2d 80 (1981)). Moreover, "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis ...." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852

(D.C.Cir.), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

In the instant case, the Acting Deputy Commissioner of the Bureau of Indian Affairs effectively declared in 1979 that the Department would no longer deal directly with the Delaware Tribe "[f]or governmental purposes" and that thereafter "[o]ur government-to-government relationship is with the Cherokee Nation which has within its membership the Cherokee Delaware Tribe." Based upon a review of the record, the Court finds that this declaration dramatically changed the nature of the dealings then in effect between the United States and the Delaware Tribe.

The 1979 letter was striking both for the superficiality of its analysis and for the sweeping impact of its conclusions. Furthermore, the 1979 letter was issued without notice and opportunity to be heard. Finally, the 1979 letter was a change in prior practice, yet it advanced no reasoned basis for its conclusions. *See Motor Vehicle Mfrs. Assoc. of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Indeed, the Court finds that had the 1979 letter been challenged in court, this action by the Department would not have been entitled to any deference whatsoever.

The process by which the 1979 letter was issued (as opposed to its substance) informs the Court's perspective on its current review of the Secretary's decision to retract the 1979 letter. As noted above, the Secretary now seeks to retract a letter which this Court believes was entitled to no deference under applicable law. Accordingly, the issue is not the same as a change of course in which deference is diminished because a previous decision, carefully considered and properly crafted, is being reversed. *See Shoshone Indian Tribe*, 903 F.2d 784. To the contrary, the

Secretary here seeks to retract a manifestly flawed declaration of policy issued without regard to legally mandated deliberation and proper procedural safeguards. Simply stated, retracting a capricious action and thereby restoring the *status quo ante* is different from retracting a prior decision that was fully considered and properly developed. Accordingly, with respect to the Secretary's decision to retract the 1979 letter, the Court finds that substantial deference under *Chevron* is appropriate.

This finding, however, does not end the analysis. The question becomes whether granting substantial deference to the Secretary's decision to retract the 1979 letter in fact resolves the issue of whether the notice issued by the Secretary on September 27, 1996, with respect to relations between the United States and the Delaware Tribe was in accordance with law.

IV

At the outset, the Court notes that the action by the Secretary at issue here may involve more than the mere retraction of the 1979 letter. Specifically, the notice dated September 27, 1996, provides in applicable part as follows:

... the Assistant Secretary hereby retracts the letter of May 24, 1979. The notice of proposed decision, 61FR33534, is hereby made final. Notice is hereby given that the Delaware Tribe of Indians is a tribal entity recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of its status as an Indian tribe.

Thus, the Assistant Secretary first retracted the 1979 letter and, second, declared the Delaware Tribe a "recognized" tribal entity, "eligible for funding and services from the Bureau ... by virtue of its status as an Indian tribe." Clearly, the former of these actions retracts the 1979 letter and restores the relationship between the Department and the Delaware to the *status quo ante*. The latter of these actions, however, potentially may constitute a declaration of new substantive policy. The Court will address each of these actions in turn.

A.

By the notice dated September 27, 1996, the Secretary expressly retracted the 1979 letter. A careful analysis of the 1979 letter and the circumstances surrounding its issuance makes clear why the Court should give substantial deference to this decision.

The 1979 letter is part of a series of letters arising out of an appeal dated October 4, 1977, of the Muskogee Area Director's approval of a plan to use certain program funds available to the Delaware Tribe of Oklahoma. The Assistant Secretary sent a response to that appeal on February 26, 1979, along with the 1979 letter. The 1979 letter contains five numbered paragraphs which purport to represent a "summary of our positions taken in those letters concerning the Cherokee Delaware Indians." Each of the five numbered paragraphs is set forth below and is followed by an analysis of its contents:

**1. Based on the 1867 Agreement and related statutes, the Cherokee Delawares are a tribe within the Cherokee Nation. They are Cherokee citizens with the same responsibilities and privileges as other citizens of the Cherokee Nation.**

At the outset, it is noteworthy that all parties agree the status of the Delawares does not result from the 1867 Agreement, which was identified as controlling authority in the 1979 letter, but rather from the 1866 Treaty. Moreover, other than the improper identification of the 1867 Agreement, the 1979 letter cited no specific statute or other authorities for support.

Furthermore, the statement insofar as it refers to the 1866 Treaty with the Cherokee, is not controverted by either Plaintiff or Defendants in the instant case. To the contrary, all parties agree that under Article 15 of the 1866 Treaty with the Cherokee, the Delawares are either "on equal terms in every respect with native citizens" (so-called "Option One") or entitled to "enjoy all the rights of native Cherokees" (so-called "Option Two").[8] Therefore, the description in this letter of Delawares as "Cherokee citizens with the same responsibilities or privileges as other citizens of the Cherokee Nation" has no substantive effect on the instant dispute.

**2. The Cherokee Delawares may deal with their judgment awards and preserve their Delaware heritage and identity. For *governmental* purposes, however, they must look to the Cherokee Nation, of which they are an integral part.** (Emphasis in original).

This paragraph contains the most significant description of the status of the Delaware Tribe, asserting that "for *governmental* purposes" the Delawares "must look to the Cherokee Nation, of which they are an integral part."

The parties do not contest that the Delawares are an "integral" part of the Cherokee Nation.[9] For the same reasons described above with respect to paragraph

one, this fact is true whether Option One or Option Two of the 1866 Treaty applies.

More importantly, the Court finds that there is nothing in the 1979 letter, the circumstances leading up to its issuance, or the record, that forms a basis for the assertions in paragraph two. Specifically, the 1979 letter contains no authorities and offers no analysis in support of its conclusion. Further, no opportunity for review and comment was provided to interested parties.

Finally, the Court observes that the language in this paragraph two of the 1979 letter to the effect that the Delawares may "preserve their Delaware heritage and identity," is evocative of the rights afforded under Option Two of the 1866 Treaty, which contemplates preservation of government-to-government relations with the United States—rather than Option One, which does not.

**3. The existing organizational structure, set forth in the 1958 bylaws, as amended, is *not* capable of adequately protecting the interests of the Cherokee Delaware people, as required by the 1972 Judgment Fund Legislation (86 Stat. 762). Our research has shown that the 1958 bylaws was adopted for the purpose of pursuing claims against the Federal Govern-**

---

8. As detailed in Plaintiff's papers, Article 15 of the 1866 Treaty with the Cherokee provides two separate options available to "civilized Indians, friendly with the Cherokees and adjacent tribes" if settled by the United States "within Cherokee country": first, for "any such tribe or band of Indians" who "abandon their tribal organization" they "shall be incorporated into and ever after remain a part of the Cherokee nation, *in equal terms in every respect with native citizens"* (emphasis added) (so-called "Option One"); and, second, for "any such tribe" that "decide to preserve their tribal organization, and to maintain their tribal laws, customs, and usages, not inconsistent with the constitution and laws of the 'Cherokee Nation, . . .' " there is a separate treatment (so-called "Option Two"). Under Option Two, "such tribe thus settled" shall "thence afterwards . . . *enjoy all the rights of native Cherokees."* (emphasis added). Thus, under both Option One *and* Option Two, the tribe has effectively "the same responsibilities and privileges as other citizens of the Cherokee Nation."

9. The term "integral" is defined in Black's Law Dictionary as follows: "Term in ordinary usage means part or constituent component necessary or essential to complete the whole."

ment relating to the period before the Delawares became part of the Cherokee Nation. Due to misunderstandings about the nature of that document, some have felt that organization, established for the Delawares a relationship with the Federal Government separate from that of the Cherokee Nation; such is not the case. (Emphasis in original).

This paragraph traces back to an action taken in 1958, "for the purpose of pursuing claims against the Federal Government relating to the period before the Delawares became part of the Cherokee Nation." This relatively recent action, taken only 21 years prior to the issuance of the 1979 letter, without any historical context, clearly cannot support the claim that the Delaware Tribe's government-to-government relations with the United States for nearly 200 years should be similarly characterized as relating exclusively to pursuing claims against the United States. Moreover, this paragraph does not contain any citations to the Assistant Secretary's purported "research" and refers to "misunderstandings" as a result of which "some have felt that organization [set forth in the 1958 bylaws] established for the Delawares a relationship with the Federal Government separate from that of the Cherokee Nation." The paragraph concludes, without any analysis whatsoever, with the bare declaration "such is not the case." There is absolutely nothing in this paragraph to suggest that the Secretary's 1996 decision to retract the 1979 letter should not receive substantial deference.

4. **No consideration will be given to any proposals for the use of funds resulting from Dockets 72/298 or proceeds from awards appropriated since 1972, until there is established an entity that meets the requirements of the above cited Act, as determined by this office.**

This statement merely sets forth a proposed course of action based on the Assistant Secretary's conclusions, and therefore no substantive analysis by the Court is required.

5. **Upon our approval of a new organizational document, proposals for the use of all judgment funds remaining to the credit of the tribe, must first be adopted, either by the adult membership or some entity which may be specifically empowered by the new organizational document to act on such matters.**

This paragraph likewise merely sets forth a proposed course of action based on the Assistant Secretary's conclusions and therefore no substantive analysis by the Court is required.

In light of the above, the Court finds that the Secretary's decision to retract each of these five numbered paragraphs, which together form the basis of the position articulated by the Secretary in the 1979 letter, should receive substantial deference by the Court because each paragraph fails to cite any supporting facts or law whatsoever for the assertions and conclusions contained therein.

Based on these five paragraphs, the 1979 letter proceeds with two additional paragraphs. Specifically, the 1979 letter provides:

In view of our positions summarized above and the failure to achieve an organizational committee, I hereby withdraw the Bureau's approval of the 1958 Delaware Bylaws, as amended. Further, I am withdrawing our recognition of those officials elected or appointed pursuant to the bylaws. Our direct dealings with the Cherokee Delaware Indians is only for purposes of claims matters. *Our government-to-government relationship is with the*

*Cherokee Nation which has within its membership the Cherokee Delaware Tribe.*

Until there can be established an appropriate entity to speak on behalf of the Delawares within the Cherokee Nation for claims purposes, we will deal with the adult membership in carrying out our responsibilities in these matters. Accordingly, I plan to promptly issue a letter to the adult Delawares within the Cherokee Nation telling them of the status of pending issues and inviting them to a meeting of that group to be held in Tulsa, Oklahoma during the latter part of July. (Emphasis added).

The effect of these two paragraphs is to declare, based on the numbered paragraphs cited above that there will be no further government-to-government relations between the United States and the Delaware Tribe.

■ The Court finds that the 1979 letter, relying on actions taken in 1958, fails to analyze, or even cite, any legal authorities which support such a sweeping change in policy. Further, such declaration of new policy was announced without regard to proper procedural safeguards. Therefore, the Court finds that the 1979 letter was both substantively and procedurally infirm. The Secretary's decision to retract the 1979 letter, therefore, is entitled to substantial deference. Applying this standard of deference, the Secretary's decision

to retract the 1979 letter is hereby sustained.

### B.

As noted previously, the Secretary's notice issued September 27, 1996, arguably encompasses two decisions: first, a decision to retract the 1979 letter and, second, a decision to declare a new policy with respect to the status of the Delaware Tribe and relations between the Delaware Tribe and the United States. As stated above, the Court hereby sustains the Secretary's decision to retract the 1979 letter and thereby to restore the *status quo ante.* The question becomes whether the Secretary's notice on September 27, 1996, also effected a substantive change in the *status quo ante* and, if so, whether that change is justified as a matter of law.[10]

■ The Court finds that the briefs to date have not adequately separated the issue of retraction of the 1979 letter from the issue of whether the 1996 notice altered the policy of the United States in place prior to the issuance of the 1979 letter (and if so, in what way and on what basis).

Based upon the above, the Court orders as follows:

1. The Secretary's decision of September 27, 1996, insofar as it retracts the 1979 letter is hereby sustained.

2. The parties shall brief the issue of whether the notice of September 27, 1996, goes beyond the mere retraction of the

---

10. The notice published in the Federal Register on June 27, 1996, states in applicable part that "... the Assistant Secretary has made a preliminary determination that the position of the Department stated in the 1979 letter should be retracted." The notice provides that "[t]he public has until July 29, 1996 to comment on this preliminary decision." The notice gives no indication that the proposed action of the Secretary was anything more

than a retraction of the 1979 letter. By comparison, the notice published in the Federal Register on September 27, 1996, states in applicable part "the Assistant Secretary hereby retracts the letter of May 24, 1979[,]" and states further that "[n]otice is hereby given that the Delaware Tribe of Indians is a tribal entity recognized and eligible for funding and services from the Bureau of Indian Affairs by virtue of its status as an Indian Tribe."

1979 letter and reinstatement of the *status quo ante* in effect prior to the issuance of the 1979 letter.

3. Assuming *arguendo* the 1996 letter announces a new substantive policy toward the Delaware Tribe compared to that in effect prior to the issuance of the 1979 letter, the parties shall further brief the issue of whether the law supports such a change in policy.

The parties shall file simultaneous briefs with respect to the issues identified in paragraphs 2 and 3 above not later than August 19, 2002, and shall file simultaneous response briefs not later than September 9, 2002.

IT IS SO ORDERED.